241 F.2d 78
 Wm. FLEMING and Bessie M. Fleming (Husband and Wife), F. Howard Walsh and Mary D. Walsh (Husband and Wife) and Mary D. Fleming Walsh, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
COMMISSIONER OF INTERNAL REVENUE, Petitioner,
v.
Wm. FLEMING and Bessie M. Fleming (Husband and Wife), F. Howard Walsh and Mary D. Walsh (Husband and Wife) and Mary D. Fleming Walsh, Respondents.
 No. 15981.
 United States Court of Appeals Fifth Circuit.
 February 1, 1957.
 
 Harry C. Weeks, Fort Worth, Tex., for petitioners. Weeks, Bird, Cannon & Appleman, Fort Worth, Tex., of counsel.
 Melva M. Graney, John N. Stull, Hilbert P. Zarky, Lee A. Jackson, Attys., Dept. of Justice, John Potts Barnes, Chief Counsel, I. R. S., Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Claude R. Marshall, Sp. Atty., I. R. S., Washington, D. C., for respondents.
 Before HUTCHESON, Chief Judge, and HOLMES and BORAH, Circuit Judges.
 HUTCHESON, Chief Judge.
 
 
 1
 These consolidated appeals, brought by the taxpayers and commissioner, respectively, from decisions of the Tax Court,[1] involve income taxes for 1948 and 1949.
 
 
 2
 Three issues,[2] corresponding to the issues decided below, are presented for review, Issues Nos. 1 and 2 on the taxpayers', and Issue No. 3 on the commissioner's petition.
 
 
 3
 Submitted on stipulated facts,[3] there were findings in accordance therewith, and a decision against taxpayers on the two issues appealed by them, and in their favor on the issue appealed by the commissioner.
 
 
 4
 On their first question, taxpayers plant themselves firmly on two decisions of this court, Commissioner of Internal Revenue v. Crichton, 5 Cir., 122 F.2d 181, holding that a city lot and mineral interests, and Fleming v. Campbell, 5 Cir., 205 F.2d 549, holding that oil payments and perpetual mineral or royalty interests, were properties of like kind. Insisting that these cases, holding in accordance with long standing regulations that the statutory phrase "like kind" refers to the nature or character of the property interest and not to its grade or quality, they urge upon us that the exchanged properties, mineral interests for ranch lands in the Fleming transfers and mineral interests for urban real estate in the Walsh transfers, were of like kind.
 
 
 5
 The tax court judge, though agreeing that the oil payment assignments constituted mineral interests and, therefore, interests in land, was of the opinion that, because the duration of these mineral interests was measured by and limited to oil of the value named in the assignments, the properties exchanged were not of like kind. In short, holding that one was an unlimited, the other a limited, interest in lands, he thought that the sufficient distinction between this and the Crichton case was that the mineral interest exchanged for urban lands there was an unlimited, and not a limited, mineral interest. He thought that the Fleming case could be distinguished because, while it involved a limited mineral interest, a limited overriding royalty or oil payment, the exchange there was of that interest solely for undivided fractional oil, gas and other mineral interests. To which the taxpayers reply that if, as was held in the Crichton case, the exchange of an unlimited mineral interest for urban property was an exchange of like kind and in the Fleming case that an exchange of limited, for unlimited, mineral interests was also an exchange of like kind, it must follow, upon the principle that things equal to the same thing are equal to each other, that any of the properties involved in the two exchanges, if exchanged for any involved in the other, would result in exchanges of like kind.
 
 
 6
 On this issue, Judge BORAH dissenting, we agree with taxpayers.
 
 
 7
 In Commissioner of Internal Revenue v. Crichton, 5 Cir., 122 F.2d 181, we pointed out that the invoked section, 112 (b) (1), is so general in its terms as to render an interpretative regulation appropriate and that the Treasury regulation invoked and sought to be applied was appropriate and valid.
 
 
 8
 In Fleming v. Campbell, 205 F.2d at pages 549, 550, quoting in the margin from the Crichton case,[4] we rejected the argument of the collector "that the mineral interest in the Ector County lands was an interest in fee and that in the Gregg County lands, for which it was exchanged, was a leasehold of a fee which does not have thirty or more years to run, and that therefore under the regulation the interests exchanged were not of like kind", saying:
 
 
 9
 "We cannot agree. In the first place, both interests exchanged were interests in land. [Citing in note 5 many cases.] In the second place, neither interest was a `leasehold of a fee' in the sense in which that term is used in the regulation. Both were interests in minerals in place. Both were therefore interests in land, interests not in personal but in real property, in short, real rights."
 
 
 10
 We are, therefore of the opinion that, in those two cases, this court, in principle, decided the question presented here, and that, upon the authority of those decisions, the judgment of the tax court on the first issue must be reversed.
 
 
 11
 If we assume that we are in error in this view, and we, therefore, reach the third issue, note 2, supra, raised on the commissioner's appeal, that the tax court erred in holding that the transactions were exchanges of property giving rise to capital gains treatment and not anticipatory assignments of income, we find ourselves in agreement with the tax court, and, for the reasons set out in Scofield v. O'Connor, 5 Cir., 241 F.2d 65 and Commissioner v. P. G. Lake, Inc., 5 Cir., 241 F.2d 71, we affirm its judgment on this issue.
 
 
 12
 We come then to a consideration of the taxpayers' second issue, raised by the Walsh appeal, that the tax court erred in holding that the amounts added in 1948 and 1949 under the amended contract with the insurance company, though not paid to taxpayers in those years, were subject to taxpayers' withdrawal and, therefore, constructively received. The tax court, stating:
 
 
 13
 "Petitioner [Mrs. Walsh] has deliberately turned her back on income, and has in effect selected the year in which she will report it. This she may not do. Further, the whole arrangement for the nonacceptance of income was voluntary on petitioner's part, she was in no way forced to surrender her right to the proceeds of the matured policy, and she could have had the interest paid to her currently as she did in the second agreement."
 
 
 14
 concluded:
 
 
 15
 "Petitioner, a cash basis taxpayer, cannot escape income tax by directing that accrued interest be accumulated for her benefit in the future. See Theodore R. Bayard, 16 T.C. 1345. * * *"
 
 
 16
 Here taxpayers insist that the commissioner and the tax court misunderstand the nature and effect of Mrs. Walsh's agreement and the law applicable thereto. Pointing out that under a valid and binding agreement made some eighteen months before the maturity of the policy and effecting a novation of the original agreement, the parties changed the terms of their contract, the taxpayers, citing Commissioner of Internal Revenue v. Oates, 7 Cir., 207 F.2d 711 as precisely in point, insist that the commissioner and the court are undertaking to make for parties, who were competent to make and had made a valid agreement, an agreement that they did not make.
 
 
 17
 Pointing to the difference between the facts of this case and those dealt with in our case of Williams v. United States, 5 Cir., 219 F.2d 523; that there the taxpayer gained nothing by his agreement for the voluntary escrow of moneys admittedly due and payable to him, except, if the plan was successful, a reduction of his taxes and that this court correctly held that moneys so voluntarily escrowed by him were constructively received by him in the year of the escrow; whereas, in this case, there was a real contract in which both contracting parties obtained benefits; taxpayers insist that the Williams case is not against, but is in support of, their contention.
 
 
 18
 We agree with taxpayers' contention. In the Williams case, the district judge and this court held that the transaction was not an installment sale but a completed one, the gain from which was immediately available and, therefore, taxable, to the seller in the year of its making, and the taxpayer could not, by voluntarily escrowing the purchase price under an agreement that he should receive it in installments, defer payment of the taxes due on the sale.
 
 
 19
 There is nothing in this record indicating anything other than arms length business transactions between Mrs. Walsh and the company, a contract maturing in 1945, and an agreement entered into eighteen months before its maturity by which, instead of receiving the whole sum in 1945, she agreed with the company that it would hold the funds until 1955, another ten years, adding to the principal amount each year interest at an agreed figure plus such additional amounts as might be appropriated each year from the life insurance company's excess earnings. As a result of the agreement, the amount of the interest added to the principal in 1948 and 1949 was greatly in excess of the guaranteed rate of 3½ percent. In short, in 1943, when her new contract was made, Mrs. Walsh contracted for a greater rate than would have otherwise been available to her if she had continued to receive only current interest payments. In the years before this court, 1948 and 1949, Mrs. Walsh not only received nothing, she had no right to receive anything.
 
 
 20
 The judgment against taxpayers on this issue must be reversed.
 
 
 21
 The judgment of the tax court is affirmed on the commissioner's appeal. On the taxpayers' appeal, it is reversed and the cause is remanded for tax redetermination in accordance herewith.
 
 
 22
 BORAH, Circuit Judge, dissents from the decision on the first issue note 2 supra.
 
 
 
 Notes:
 
 
 [1]
 24 T.C. 818
 
 
 [2]
 These are: (1) The taxpayers exchange limited overriding royalty or oil payment interests (carved by them out of larger oil and gas interests) for, in one case, a ranch; and, in the other, urban business property
 The question is whether the exchanged properties were of "like kind" within the purview of Sec. 112(b) (1) Internal Revenue Code of 1939, 26 U.S.C.A. § 112(b) (1), so that, all other requirements of said section being met, no taxable gain from the exchanges is to be recognized.
 (2) Taxpayer, Mrs. Walsh, in 1943, agreed with a life insurance company that the proceeds of a 10 year endowment life insurance policy on her life — maturing in 1945 — should, after such maturity, be held by the insurance company for an indefinite period of time, not within her control, and, during the first ten years of this extended period, improved with interest, after which interest on the total amount was to be paid to her periodically for the remainder of her life and thereafter as she directed in the agreement.
 The question is whether the amounts of the interest improvements in 1948 and 1949, not paid or subject to withdrawal in those years, were nevertheless constructively received during said years by Mr. and Mrs. Walsh — "cash basis" taxpayers.
 (3) If the first question presented by the taxpayers is decided adversely to them, then should the Tax Court's holding that said exchanges produced long-term capital gain be affirmed, or should the Commissioner be sustained in his contention that the taxpayers merely assigned future income and thereby received ordinary depletable income.
 
 
 [3]
 Those pertinent to the first and third issues may be thus summarized:
 All of the tax returns involved were filed upon the cash receipt and disbursement basis. Wm. Fleming, the partnership, Fleming Oil Co., Wm. Fleming, Trustee, and F. Howard Walsh, and each of them, were, among other activities, engaged in the business of producing oil and gas. All of the oil and gas properties held by any of those just named and involved in this proceeding had been held by them for several years for productive use in their said trade or business and not for sale.
 On May 19, 1948, the Flemings acquired from Mrs. Cline — in the proportions of 50%, 25% and 25% — the fee simple title to some 2994.5 acres of ranching land situated in Parker and Tarrant Counties, Texas, and thereafter held said lands for investment and not for sale.
 The sole consideration given Mrs. Cline for this ranch was the assignment to her by the Flemings of limited overriding royalty or oil payment interests in various producing oil and gas properties then owned by the respective transferrors, and by the terms of the transfer Mrs. Cline became entitled to various fractions of the oil thereafter to be produced from the properties until she had received: from the Fleming Oil Company assignment — oil of the value of $147,000; from the Wm. Fleming assignment — oil of the value of $73,500; from the two Wm. Fleming Trustee assignments — oil of the value of $49,000 and $24,500, respectively, plus the same interest factor in all. One of the Trustees' oil payment assignments was out of leasehold interests, the other out of a royalty interest.
 The assignment from Fleming Oil Co. is typical and only its pertinent terms will be set out. It involved four ordinary commercial oil and gas leaseholds in which Fleming Oil Company was then the owner of an undivided one-half interest; and recited that for a valuable consideration Fleming Oil Company conveyed to Mrs. Cline:
 "The following described real property, to-wit, An overriding royalty or mineral interest carved out of the interest owned by Fleming Oil Company in each and all of the oil and gas leases above described, amounting to an undivided 48/128 interest in and to all of the oil in, under and that may be produced, saved and marketed from the above described tracts of land under the terms of the oil and gas leases covering the same, until the grantee above named shall have received therefrom oil of the net value of $147,000, plus an amount equal to 5% interest per annum from May 19, 1948, on the portions of the said $147,000 which may be unsatisfied from time to time."
 The instrument further provided that no interest in gas, casinghead gas or in the personal property then on or thereafter placed upon the property was conveyed; that grantee was to be entitled to receive the amount specified from the fractional part of the oil conveyed in addition to such gross production or severance taxes as might be imposed thereupon; that the conveyance was effective June 1, 1948; that all development and operating costs and expenses were to be borne by Fleming Oil Company; and that, when the grantee had received oil of the net value specified, her interest was to terminate. The instrument also provided:
 "The execution of this conveyance shall not impose upon grantor any obligation with respect to developing or operating the property covered hereby, nor shall it be implied herefrom the grantor is in anywise obligated to see that grantee receives oil aggregating the net value of $147,000, plus an amount equal to 5% as above provided, or any lesser sum; but grantor does covenant and agree that grantee shall have the same but no greater right to require the grantor to develop and operate said property, in accordance with the terms of the original lease upon said property, as the original lessors therein, their heirs or assigns, might have or exercise."
 On Oct. 5, 1949, taxpayer F. Howard Walsh, in accordance with an existing agreement so to do, acquired from one C. C. Cross the fee simple title to revenue producing business real estate located in Fort Worth, Texas, and as the sole consideration for this conveyance, conveyed to Cross a limited overriding royalty or oil payment interest out of some six producing oil and gas leases in which Walsh then owned interests. The conveyance was in terms substantially similar to the terms of the Fleming Oil Company conveyance just summarized and entitled Cross to the specified fractions of oil, when, as and if produced, until he had received, free and clear of all costs and expenses, oil of the value of $65,000, plus an amount equal to interest on monthly declining balances at the rate of 7% per annum. Walsh acquired and has held the aforesaid business property for investment and not for sale. All of the oil and gas leases involved were ordinary commercial oil and gas leases.
 The properties acquired by the respective taxpayers in these exchanges had a fair market value equal to the face amount of the respective oil payments conveyed therefor.
 It could be estimated at the time the case was submitted to the Tax Court that the oil payment assigned by Fleming Oil Co. would pay out in approximately 5 years and 8 months from its effective date; that from Wm. Fleming, in from 10 to 12 years from its effective date; and each of the oil payments assigned by Wm. Fleming, Trustee, in from 7 to 8 years from their respective dates. Likewise, it could have been estimated that the F. Howard Walsh oil payment would pay out in approximately 3½ years from its effective date.
 Those pertinent to the second issue are:
 The other issue presented involves Mr. and Mrs. Walsh only, and as to this issue the record discloses that on March 28, 1935, Mrs. Walsh (then Mary D. Fleming) acquired from Southwestern Life Ins. Co. a 10 year endowment policy in consideration of ten annual premiums of $2,245.75 each, which were duly paid. The policy provided that if the insured lived to the policy's maturity (March 28, 1945) the insured might within 31 days after such maturity select one of the following options of settlement:
 
 
 [1]
 $25,000 in cash;
 
 
 [2]
 $16,400 in cash and a paid up policy for $25,000; or
 
 
 [3]
 A paid up policy for $72,825
 On September 15, 1943 — some year and a half before the policy matured — Mrs. Walsh entered into an agreement with the insurance company by which, at the maturity of the policy, the payment of the $25,000 proceeds was to be deferred —
 "* * * until paid as herein provided:
 "Interest on the unpaid portion of such sum at the guarantee rate of three and one-half per cent per annum, and such additional interest, if any, as may be apportioned thereto by the Company from surplus interest earnings, shall be added to the principal on March 28, each year, until March 28, 1955, and thereafter paid monthly as it accrues, subject to the limitation hereinafter specified, the first payment to be made April 28, 1955. Such interest shall be paid to me, if living, otherwise to the payee or payees as hereinafter designated."
 There followed in the agreement provisions for payment after Mrs. Walsh's death to her children and grandchildren, and the instrument concluded:
 "It is understood and agreed that the Agreement to be issued and dated March 28, 1945, pursuant to this request, cannot be changed or amended, but the beneficiary may be changed with the consent of William Fleming, my father, upon written request and proper endorsement thereon. All payments provided herein shall be payable at the Home Office of the Company in the City of Dallas, Texas."
 In accordance with this, on March 28, 1945, the Life Insurance Company issued an instrument acknowledging the maturity of the policy and that in satisfaction of the obligations of the policy it —
 "Promises to pay at its Home Office in the City of Dallas, Texas, the proceeds of said policy in accordance with the option method of settlement selected by Mary D. Fleming Walsh, the insured, in writing, a photostatic copy of such election being hereto attached and made a part hereof."
 Nothing was paid to Mrs. Walsh, or anyone else, by the insurance company under said settlement agreement, during the years 1948 and 1949, and Mr. and Mrs. Walsh reported no income from that source in those years. But in determining the deficiencies due by Mr. and Mrs. Walsh for 1948 and 1949 the Commissioner treated as interest income constructively received by them $2,132.18 and $2,206.81, respectively; these amounts being the amounts added to the principal due under the interest provision above quoted from the settlement agreement.
 
 
 [4]
 "* * * the regulation and the interpretation under it, leave in no doubt that no gain or loss is realized by one, other than a dealer, from an exchange of real estate for other real estate, and that the distinction intended and made by the statute is the broad one between classes and characters of properties, for instance, between real and personal property. It was not intended to draw any distinction between parcels of real property however dissimilar they may be in location, in attributes and in capacities for profitable use." Commissioner of Internal Revenue v. Crichton, 122 F.2d at page 182