**ALABAMA BY-PRODUCTS CORPORATION, Plaintiff,**

v.

**George D. PATTERSON, District Director of Internal Revenue, Defendant.**

**Civ. A. No. 8310.**

United States District Court
N. D. Alabama, S. D.

May 13, 1957.

William Bew White, Samuel M. Bronaugh, William Bew White, Jr. and Edward M. Selfe, of White, Bradley, Arant, All & Rose, Birmingham, Ala., for plaintiff.

Charles W. Mehaffy and Richard Roberts, Attys., and James P. Garland, Chief, Trial Section, Dept. of Justice, Washington, D. C., and W. L. Longshore, U. S. Atty., Birmingham, Ala., for defendant.

LYNNE, Chief Judge.

This cause, coming on to be heard, by agreement of the parties was tried to the court without the intervention of a jury. After careful consideration of the pleadings, the stipulations of the parties and the evidence adduced upon the trial of the case, the court proceeds to make and enter the following findings of fact, conclusions of law and judgment.

### Findings of Fact

1. The plaintiff is a Delaware corporation with its principal place of business in Birmingham, Alabama.

2. For the calendar year 1952, the plaintiff filed with defendant income and excess profits tax returns within the time provided by law and on account thereof timely paid income and excess profits taxes in the amount of $2,708,371.59. Thereafter, defendant assessed the plaintiff and the plaintiff paid to defendant as additional income taxes $1,766.19 with respect to the calendar year 1952, and interest thereon in the amount of $301.-99, also within the time provided by law.

3. Thereafter and within the time permitted by law, plaintiff filed with the defendant a claim for refund in the amount of $588,586.97. It later filed an amended claim for refund in the amount of $590,353.16, all as provided by law in such cases. The claims for refund were based upon the plaintiff's corrected computation for 1952 of its percentage depletion on its mining of coal under Section 23(m) of the 1939 Code, 26 U.S.C.A. § 23(m) by use of the proportionate profits method. Said claims for refund were thereafter, in the manner provided by law, disallowed by the defendant and this suit was brought by the plaintiff.

4. In its returns for income and excess profits taxes for the calendar year 1952, plaintiff showed a gross income of $6,223,080.10 and a net income of $4,-555,457.81, and in the computation of said net income plaintiff deducted for depletion of mineral resources the sum of $21,962.04. Of this amount plaintiff's deduction for depletion of coal was $20,-729.50.

5. All necessary conditions precedent to the bringing of this action have been done or taken by the plaintiff and the court has jurisdiction of the proceeding.

6. On its return for 1952 plaintiff, in computing percentage depletion on coking coals, used a representative market or field price. Plaintiff took no percentage deduction on such return but only took unit or cost basis depletion on its coal.

7. The figure used by plaintiff as the representative field price of the coking coal used in its ovens was determined on the basis of sales made.

8. For many years prior to 1952 and during the year 1952, the plaintiff's principal business has been the mining of coal in the Warrior coal field in Alabama, the coking of coal at its by-product coke oven plant in Jefferson County, Alabama,

and the sale of coke and by-products and of coal mined by it.

9. There are four coal fields in the State of Alabama. They are Warrior, Cahaba, Coosa and Plateau. Only bituminous coal is found in these fields. The plaintiff mined coal in 1952 from the Mary Lee seam and the Black Creek seam, both of which are in the Warrior field.

10. Blast furnace coke is used in blast furnaces to reduce iron ore to iron. Foundry coke is used in iron foundries to melt iron or other metals in a cupola for making castings.

11. The standards of coke for use in a foundry are more exacting than of coke for use in a blast furnace.

12. It is the prevailing practice in the industry to blend several coking coals with different inherent qualities to make a commercial foundry coke. The characteristics of foundry coke are derived from the inherent characteristics of the coking coals which are blended to produce the coke.

13. The total coke production in 1952 in the United States was 58,182,747 tons, of which 3,102,446 tons, or approximately 6% of the total, was foundry coke. The plaintiff produced 20% of the national output of foundry coke in 1952, selling foundry coke to approximately 400 customers in 32 states.

14. A coking coal contains bitumens which under the influence of heat first soften; then at a higher temperature become fluid; at a still higher temperature break down and decompose with the evolution of gas, at which point the remaining material sets and the bitumens bind all the particles of coal left together acting as an agglutinating agent to form a cake or coke. A coking coal should have sufficient bitumens or agglutinating materials to bind it together. The agglutinating characteristics of Alabama coking coals vary widely with different coking coals. In addition to variation in agglutinating properties Alabama coking coals vary in their chemical analyses, i.e., the amounts of fixed carbon, volatile matter, sulphur and ash in the coking coal. Alabama coking coals also differ in the amount of carbon which the coke made therefrom imparts to the metal heated by the coke, which is referred to herein as the carbon pickup quality of the coking coal. Alabama coking coals also vary in the physical structure of the coke made from them, the strength of the coke varying with the size of the air cells in the coke.

15. In order to determine whether a particular coal has the inherent characteristics to produce the type of coke required by any particular user of coke, plaintiff finds it necessary to make the following progressive tests: (1) by chemical analysis determine the amounts of fixed carbon, volatile matter, ash and sulphur in the coal, but a favorable chemical analysis alone will not assure that the particular coal will make a commercial coking coal; (2) by various tests, including the Geisler test for plasticity, determine the coking or bitumen properties of the coal; (3) determine the physical chacteristics of the coke produced from the coal when blended with other coking coals in an oven test with about 300 lbs. of coal; (4) determine the characteristics of the coke produced from a full oven test of the coal blended with other coking coals; (5) determine how the coke produced from the coal in question reacts in a foundry cupola test wherein the metal is actually heated with the coke and the heated metal is analyzed to see what characteristics it picked up from the coke.

16. In addition to the above generally accepted tests of a coking coal, the plaintiff tested coking coals to determine their carbon pickup by making a coke from the particular coal without blending with other coking coals and then testing such coke in a cupola by melting iron to determine how much carbon was imparted to the iron.

17. The coal in that part of the Mary Lee seam which extends west of the Warrior River (including the Barney and Samoset mines of the plaintiff) is not suitable for making a coke which can be used commercially as either a blast furnace coke or a foundry coke. The Mary Lee coal produced from the following mines is not suitable for making blast furnace coke or foundry coke:

| Company | Mine | County |
| --- | --- | --- |
| Brilliant Coal Company | Calumet | Walker |
| Brookside-Pratt Mining Co. | Warrior River | " |
| Galloway Coal Mining Co. | No. 21 Strip | " |
| Mammoth Coal Mining Co. | Mammoth | " |
| National Fireproofing Corp. | Nat'l No. 26 | " |
| Stith Coal Company | Aldridge | " |
| Alabama By-Products Corp. | Barney | " |
| Alabama By-Products Corp. | Samoset | " |

18. The Black Creek seam extends in a southeast-northwest direction through Jefferson County, Alabama. The characteristics of Black Creek coal change as you proceed from southeast to northwest. The characteristics of the Black Creek coking coal produced by plaintiff at Bradford and Thermal differ from the Black Creek coking coal produced as the Dixie Fire Brick Company mine, the Black Creek coking coal produced by the DeBardeleben Coal Corporation mines at Empire and Sipsey, and the Black Creek coking coal produced in the so-called Nyota area which lies north of Bradford and Thermal. The Black Creek coal mined in Walker County from the mines of Brilliant Coal Company, Brookside-Pratt Mining Company, and Galloway Coal Mining Company is not suitable for making blast furnace coke or foundry coke.

19. Pratt and American seam coals contain a high percentage of sulphur and therefore are not suitable for use by plaintiff in making its foundry coke.

20. Brookwood-Milldale seam coals will not make a foundry coke to conform to plaintiff's specifications.

21. The Black Creek coking coal mined by the plaintiff has different inherent characteristics than the Mary Lee coking coal mined by the plaintiff, i. e., difference, in carbon pickup, agglutinating properties, ash content and in the physical structure of coke manufactured therefrom.

22. The Blue Creek coal mined by the Black Diamond Mining Company from its Johns and Adger mines is a different coking coal than the Mary Lee coking coal mined by the plaintiff from its Praco, Labuco and Colta mine area because such Mary Lee coking coal produces a coke which imparts substantially less carbon to the metal heated by the coke than does coke produced from Blue Creek coking coal.

23. The coal from the Underwood seam at Tait's Gap (sometimes referred to as Underwood Black Creek seam) differed from the plaintiff's Bradford-Thermal Black Creek coal in that the volatile content was higher and the coking properties were lower, and such coal was considered undesirable for plaintiff's foundry coke. The Bradford-Thermal Black Creek coal had lower ash content, lower volatile content, and lower sulphur content. The Underwood-Black Creek seam coal which was sold by the Robbins Coal Company to the Sheffield Steel Corporation in Houston, Texas, was used to manufacture blast furnace coke and was sold unwashed by Robbins Coal Company to Sheffield Steel Corporation.

24. The Gholson seam, the Thompson seam, the Woodstock seam and the Mammoth seam are all in the Cahaba coal field, whereas the Mary Lee and Black Creek seams being mined in 1952 and theretofore are in the Warrior coal field.

25. Plaintiff operated in the year 1952 mines at Praco, Colta and Labuco

on the Mary Lee seam in the Warrior field. It also contracted with certain miners to mine coal from its lands located within a three-mile radius of its Praco, Colta and Labuco mines and to deliver such coal run-of-mine to its Praco washer. These contract miners delivered 119,661 tons of Mary Lee coal to the Praco washer in 1952. In addition, the plaintiff contracted with Messrs. Moon and Kirkwood to mine Mary Lee coal from the plaintiff's lands at Littleton, Alabama, and deliver such coal run-of-mine to the Praco washer. Messrs. Moon and Kirkwood delivered 73,334 tons of Mary Lee coal to the Praco washer in 1952. The Littleton area is about 12 to 14 miles from Praco.

26. The plaintiff's Praco, Colta and Labuco mines are slope mines and are what are generally considered in the Birmingham district to be mechanical mines. In the case of the Praco mine, the mining is performed at 600 to 800 feet in depth and the coal haul from the face of the mine to the entry is approximately 3½ miles. The depth at Colta and Labuco is not as great as Praco and the haul is not quite as far.

27. All the coal removed from the Mary Lee seam by the plaintiff and its contractors is run-of-mine coal and is cleaned, broken, sized and loaded for shipment at a preparation plant located at the entrance to the Praco mine. Unwashed or run-of-mine coking coal produced in Alabama was not satisfactory for plaintiff's use in making foundry coke in 1952. The preparation plant cleaned the smaller size coal, ½ inch and down, on table washers; the larger coal was cleaned by jig washers.

28. All the Mary Lee coking coals mined by and for the plaintiff from the Praco, Labuco and Colta mine area, including the contract tonnage other than that of Moon and Kirkwood, was interchangeable and could be substituted one for another in producing its foundry coke.

29. Black Creek coal mined by the plaintiff at its Bradford-Thermal mines was cleaned, broken, sized and loaded for shipment at preparation plants located at the entrances to the Bradford and Thermal mines. Bradford and Thermal were underground slope mines semi-mechanically mined. The underground haul from the face of the mine to the entry of the Bradford mine was from 5 to 5½ miles. The length of the coal haul at Thermal was somewhat less. In addition to the 193,666 tons of Black Creek coal mined by the plaintiff at Bradford and Thermal, Messrs. Calvert and Youngblood delivered 84,402 tons of Black Creek coal to the plaintiff, of which 6,499 tons were mined by Calvert and Youngblood from plaintiff's lands and 77,903 tons were mined from lands owned or leased by Calvert and Youngblood. The Calvert and Youngblood coal was strip-mined and delivered to the plaintiff without having been cleaned, broken or sized. It was cleaned, broken, sized and loaded for shipment by the plaintiff. The 84,402 tons of Black Creek coal delivered to the plaintiff by Calvert and Youngblood constituted all the coal mined by them.

30. In 1952 the plaintiff produced two grades of foundry coke: (a) coke for use in grey iron foundries, representing 82% of production, and (b) coke for use in malleable iron foundries, representing 18% of production.

31. During the years 1949 through 1953 the plaintiff prepared (both from its own mines and from the mines operated by its contract miners at Praco, Colta, Labuco and Littleton) the following amounts of washed Mary Lee coal:

| Year | Tons |
|------|------|
| 1949 | 858,561 |
| 1950 | 836,233 |
| 1951 | 805,786 |
| 1952 | 772,480 |
| 1953 | 662,685 |

32. During the years 1949 through 1953 plaintiff prepared (both from its own mines at Bradford and Thermal and

from its own lands strip-mines by Calvert and Youngblood) the following amounts of washed Black Creek coal:

| Year | Tons |
|------|------|
| 1949 | 146,468 |
| 1950 | 202,869 |
| 1951 | 255,011 |
| 1952 | 200,165 |
| 1953 | 226,699 |

33. During the years 1949 through 1953 the plaintiff acquired the following amounts of Black Creek coal before cleaning, breaking, sizing and loading for shipment from Calvert and Youngblood which was all of the coal mined by the latter from lands owned or leased by them:

| Year | Tons |
|------|------|
| 1949 | 43,176 |
| 1950 | 52,113 |
| 1951 | 55,330 |
| 1952 | 77,903 |
| 1953 | 35,621 |

All coal mined by Calvert and Youngblood was strip-mined.

34. During the year 1952 the plaintiff sold 86,690 tons of Mary Lee coal prepared at its Praco preparation plant to the following purchasers for the following uses at the following prices:

| Purchaser | Tons | Size | Use | Price Range |
|-----------|------|------|-----|-------------|
| Seaboard Air Line RR Co. | 4,827 | 3″ x 2″ | Locomotive | $5.05 |
| Republic Steel Corp. | 29,981 | 2″ x 0″ | Coking | 6.00 |
| DeBardeleben Coal Corp. | 44,691 | 2″ x 0″ | Coking | 6.30 – 6.89 |
| Employees (Per United Mine Workers Contract) | 3,536 | 1″ x 3″ | Domestic | 6.45 – 6.90 |
| E. I. du Pont de Nemours & Co. | 3,306 | 2″ x ½″ | Steam | 6.55 – 7.10 |
| Board of Education | 64 | 1″ x 3″ | Nut | 7.38 – 7.93 |
| Others | 66 | 3″ x 0″ | Steam | 6.34 |
| Tenants | 219 | 1″ x 3″ | Domestic | 6.45 – 6.90 |

35. DeBardeleben Coal Corporation purchased coking coal from plaintiff, Black Diamond Coal Mining Company and Twin Seam Mining Company during the years 1951 through 1955.

36. TCI Division of the United States Steel Corporation purchased coking coal during the years 1951 and 1952.

37. United States Pipe & Foundry Company purchased coking coal during the years 1951 through 1955.

38. During the year 1952 Republic Steel Corporation purchased 43,470 tons of Mary Lee coking coal and 55,722 tons of Pratt coking coal through Franklin Coal Company. Republic Steel Corporation also purchased 1,350 tons of Brookwood coking coal. All this coal was unwashed.

39. During the year 1953 Republic Steel Corporation purchased through Franklin Coal Company 85,030 tons of Mary Lee coking coal and 73,256 tons of Pratt coking coal. All this coal was unwashed.

40. One coal sales agency at Birmingham, the Smith Coal Sales Company, during the year 1952 sold 371,655 tons of coal. Of that tonnage, 221,697 tons were coking coals. Of the 221,697 tons of coking coal, 98,416 tons were sold for coking purposes.

41. There were other sales agencies at Birmingham engaged in selling coking coal.

42. Of the coking coal sold by the Smith Coal Sales Company, about 10,000 tons were sold in the Birmingham district.

43. DeBardeleben Coal Corporation, of Birmingham, was engaged in the manufacture of high-grade foundry coke. The quality of the coke manufactured by DeBardeleben Coal Corporation is such that it is competitive with that manufactured by plaintiff. To a certain extent it was sold on the same market as that of plaintiff. Some of DeBardeleben Coal Corporation's customers are customers of plaintiff. The price received by DeBardeleben Coal Corporation for its coke is the same as that received by plaintiff.

44. DeBardeleben used a blend of Black Creek, Blue Creek, Mary Lee, and a low-volatile from West Virginia in the manufacture of its coke.

45. There was in 1952 in the Birmingham district a representative market or field price for coking coals of like kind and grade as that used by plaintiff in the manufacture of coke.

46. In 1952 the plaintiff did not sell any of its Bradford-Thermal Black Creek coal for use in a by-product coke oven plant. In 1952 it sold to approximately 75 different customers about 6,838 tons of blacksmith coal at prices ranging from $9.31 to $10.65 per ton f.o.b. mine. It also sold 16 tons of Black Creek lump coal to the Bradford Negro School at $10.59 per ton f.o.b. mine. It sold 1346 tons of Black Creek domestic coal to its employees at Bradford pursuant to its Union contract for prices ranging from $8.65 to $9.65 per ton f.o.b. mine. It sold from its Thermal mine Black Creek steam coal to Stockham Valves & Fittings, Inc., 1,244.80 tons at prices ranging from $8.20 to $8.68 per ton f.o.b. mine, and sold 381 tons to its employees pursuant to Union contract at prices ranging from $8.00 to $8.75 per ton f.o.b. mine.

47. During the months of January through September of 1952 plaintiff acquired under contract all of the coal produced by the Dixie Fire Brick Company which amounted to 44,629.65 tons of Black Creek coal at a price of $6.50 per ton f.o.b. mine and incurred a freight charge of 55¢ per ton for delivery to the plaintiff's coke ovens, making a total delivered price of $7.05 per ton. In November and December it acquired under contract all of the coal produced by the Dixie Fire Brick Company which amounted to 8,770.75 tons of Black Creek coal at a price of $7.07 per ton f.o.b. mine and a freight charge of 55¢ per ton, making a total delivered price of $7.62. The following is a schedule reflecting the purchases of Black Creek coal by the plaintiff from Dixie Fire Brick Company during the years 1947 through 1953:

| Year | Tonnage | Average Price Per Ton FOB Mine |
|------|---------|------------|
| 1947 | – | $ – |
| 1948 | 30,593 | 7.13 |
| 1949 | 47,090 | 6.80 |
| 1950 | 54,466 | 6.87 |
| 1951 | 23,039 | 6.50 |
| 1952 | 53,400 | 6.59 |
| 1953 | 61,566 | 7.04 |

48. During the year 1952 plaintiff purchased 119,612.40 tons of Indian Maid and Gaston seam Pocahontas coal from West Virginia at delivered prices ranging from $10.19 per ton to $11.49 per ton and f.o.b. mine prices ranging from $5.30 per ton to $6.31 per ton.

49. During the years 1949 through 1955 the Tennessee Coal & Iron Division of United States Steel Corporation and Republic Steel Corporation sold no Mary Lee coal except sales to employees pursuant to Union contracts. With the exception of 621 tons in 1951, the United States Pipe and Foundry Company (and its predecessor Sloss-Sheffield Steel and Iron Company) did not sell any Mary Lee coal during the years 1951 through 1955 other than sales to employees pursuant to Union contracts. During the years 1951 through 1955 DeBardeleben Coal Corporation sold Mary Lee nut and steam coal from its Hull mine, but it did not sell any Mary Lee coking coal during such years. The Hull mine of the DeBardele-

ben Coal Corporation did not produce a satisfactory coking coal for commercial purposes.

50. During the years 1949 through 1955 the plaintiff sold for use as coking coal Mary Lee coal after being treated with the ordinary beneficiating processes as follows:

| Year | Tons |
|------|------|
| 1949 | 181,680 |
| 1950 | 242,022 |
| 1951 | 111,622 |
| 1952 | 74,672 |
| 1953 | 41,607 |
| 1954 | 9,401 |
| 1955 | None |

The plaintiff's average cost of production of Mary Lee coking coal in 1952 was $6.643 per ton. All of the Mary Lee coking coal sold in 1952 by the plaintiff to Republic Steel Corporation was sold at less than the plaintiff's average cost of production of its Mary Lee coking coal. All of the Mary Lee coking coal sold during the months of January through September, 1952, by the plaintiff to DeBardeleben Coal Corporation was sold at less than the plaintiff's average cost of production of its Mary Lee coking coal. Such sales were made in order to enable the plaintiff to spread its fixed costs of mining at its Praco, Colta and Labuco mines and to enable the plaintiff to give additional work to its employees and thereby keep its employees from going to other mining companies which were operating on a five-day week and giving more work to their employees. The Praco mine was on a 3.3 day week in 1952. The cost of production per ton at a mine increased sharply when the number of work days per week decreased. Thus, a decrease from four days to three days resulted in an increase in cost of 50¢ per ton at the Praco mine and a drop from three days to two days resulted in an increase in such cost of about $1.35 per ton.

51. In the years 1951 through 1955, DeBardeleben Coal Corporation and United States Pipe and Foundry Company purchased Blue Creek coal. Blue Creek was coal mined from the Blue Creek seam in Jefferson County, Alabama. All of the Blue Creek coal so mined was mined from property of the Tennessee Coal & Iron Division of United States Steel Corporation.

52. During the years 1951 through 1955 there were no sales of Mary Lee coking coal which had been treated with the ordinary beneficiating processes of cleaning, breaking, sizing and loading for shipment other than the sales of Mary Lee coking coal made by the plaintiff which are stated in Paragraph 50 above of the findings of fact. The 43,470 tons of Mary Lee coking coal sold by Franklin Coal Mining Company in 1952 to Republic Steel Corporation had not been treated with the ordinary beneficiating processes (i.e., it was unwashed coal) by Franklin Coal Mining Company prior to its sale to Republic Steel Corporation.

53. The cost of production reflected on the plaintiff's books of accounts of Mary Lee coal at the plaintiff's Praco mine was $7.103 per ton. The cost reflected on the plaintiff's books of accounts to the plaintiff of the 192,995 tons delivered to the plaintiff's Praco washer by its contract miners was $5.85 per ton after having been cleaned, broken, sized and loaded for shipment by the plaintiff. The cost of production reflected on the plaintiff's books of accounts of coal at Labuco was $7.414 per ton and at Colta $6.979 per ton. The cost of production reflected on the plaintiff's books of accounts of Mary Lee coal at the Barney mine of the plaintiff was $4.723 per ton. The cost of production of coal by the plaintiff from its Bradford mine reflected on the books of accounts of the plaintiff was $8.911 per ton. The cost of production of coal by the plaintiff at its Thermal mine reflected on the plaintiff's books of accounts was $8.499 per ton. After the reallocation of certain indirect expenses charged against the plaintiff's

costs of production of coal, the above stated costs of production were as follows:

| Mine | Reduction in Cost | Revised Cost Per Ton |
|------|------|------|
| Praco | $0.087 | $7.016 |
| Labuco | 0.134 | 7.280 |
| Colta | 0.155 | 6.824 |
| Bradford | 0.12 | 8.791 |
| Thermal | 0.079 | 8.420 |
| Barney | 0.095 | 4.628 |
| Praco Contract | – | 5.85 |

54. During the year 1952 the plaintiff had an unqualified right to cancel the contracts pursuant to which the persons referred to in paragraph 14 of the Stipulation of Facts, other than Moon and Kirkwood, delivered coal to the plaintiff's Praco washer from the plaintiff's lands. In the case of Moon and Kirkwood, the plaintiff had a right to cancel the contract with Moon and Kirkwood due to adverse business conditions on 30 days' notice. During 1952, under all such contracts, including that of Moon and Kirkwood, such persons were paid a fixed amount per ton for coal delivered to the plaintiff's Praco washer regardless of the disposition made of the coal by the plaintiff. None of such persons had the right to mine coal and sell to the public, but on the contrary all of such persons, including Moon and Kirkwood, were required by their contracts with the plaintiff to deliver all coal mined by them from the plaintiff's land to the plaintiff. All of the 192,995 tons of Mary Lee coal mined by such parties was mined from lands owned by the plaintiff.

55. On its income tax returns for the years 1951 and 1952 plaintiff reported its receipts from contract miners as royalties and as gain from disposal of coal under Section 117(k) (2). In a schedule attached to the income tax return for 1952 plaintiff made the statement that "(During 1949 the company began crediting royalties against cost of coal purchased where the coal was bought back from the vendees. It has continued this practice.) In 1952 royalty coal purchased back was as follows: * * *."

56. Coking coal can be used for purposes other than for the manufacture of coke.

57. The plaintiff was unable to find any other Alabama coking coal interchangeable with Mary Lee coking coal mined by or for the plaintiff from mines in the Praco, Colta, and Labuco area for the manufacture of malleable iron foundry coke.

The principal reserves of coals which could be coked for commercial foundry coke or to make blast furnace coke for the period 1947 through 1955 were owned by the Tennessee Coal & Iron Division of the United States Steel Corporation, Woodward Iron Company, Republic Steel Corporation, United States Pipe and Foundry Company, DeBardeleben Coal Corporation or the Alabama By-Products Corporation. Except for DeBardeleben, the other named companies used their own coals to meet their own requirements and did not generally offer them for sale in a public market.

Conclusions of Law

1. The court has jurisdiction of this action and of the parties hereto.

2. Plaintiff, taxpayer, failed to discharge its burden of proving by a fair preponderance of the evidence that there was no "representative market or field price of [coal] of like kind and grade" as compared with plaintiff's Mary Lee and Black Creek coal mined by it in 1952.

3. In view of the foregoing conclusion, plaintiff was not entitled to use the proportionate profits method of computing percentage depletion on coal mined by it during 1952. Section 39.23(m)–1 (e) of Regulations promulgated by the Commissioner of Internal Revenue under the authority granted to him by Section 23(m) of the Internal Revenue Code of 1939.

4. The court rejects plaintiff's contention that the end product test should be applied to determine whether coal mined from one seam in the Birmingham district is of like kind and grade as coal

mined and marketed from another seam in such district.

5. All bituminous coal mined and marketed in the Birmingham district is of like kind to plaintiff's Mary Lee and Black Creek coal. Cf. Flemming v. Commissioner of Internal Revenue, 5 Cir., 1957, 241 F.2d 78. It is the opinion of the court that all bituminous coal mined and marketed in the Birmingham district having coking properties for any commercial usage is coal of like grade to plaintiff's Mary Lee and Black Creek coal whether or not it is suitable for use by plaintiff in its blends of coals for the production of furnace or foundry coke.

6. During the year 1952 the contractors with whom plaintiff dealt in the Praco, Colta, and Labuco area and in the Littleton area had no economic interest in the 192,995 tons of coal which they mined from the property owned by the plaintiff. During the year 1952, Messrs. Calvert and Youngblood had no economic interest in the 6,499 tons of coal which they mined from lands owned by the plaintiff in the Bradford-Thermal area. Plaintiff, therefore, is entitled to the entire depletion deduction on such tonnage.

7. The filing of plaintiff's amendment to its complaint, stating a fifth and sixth cause of action at the conclusion of the trial, was disallowed because, in the opinion of the court, the claim for refund did not raise the question as to the representative market or fair price for plaintiff's coal if it was not the price used by plaintiff on its income and excess profits tax returns for 1952. On the contrary, claim for a refund was based upon the flat contention that there was no representative market or field price for such coal. It is the court's opinion that Burrell v. Fahs, 5 Cir., 1956, 232 F.2d 163, is not opposed to this result.

8. Plaintiff's contention in its third and fourth causes of action relating to an erroneous computation of plaintiff's net income from mining for the purpose of computing its percentage depletion on coal mined from its Praco, Colta, Labuco,

Bradford, Thermal and Barney mines in that overhead and other costs of plaintiff's operations have been improperly allocated to plaintiff's mining operations at these mines, was not raised in its claim for refund.

9. The holding in favor of plaintiff expressed in conclusion number 6, supra, does not entitle plaintiff to any refund.

10. Defendant is entitled to a judgment dismissing this action at the cost of plaintiff.