UNITED STATES PIPE & FOUNDRY COMPANY, Plaintiff,

v.

George D. PATTERSON, District Director of Internal Revenue, et al., Defendants.

Civ. A. No. 8902.

United States District Court
N. D. Alabama, S. D.
March 2, 1962.

Wm. Bew White, Jr., and Edward M.
Selfe, White, Bradley, Arant, All & Rose,
Birmingham, Ala., and Joseph B. Bren-
nan, Sutherland, Asbill & Brennan, At-
lanta, Ga., for plaintiff.

Macon L. Weaver, U. S. Atty., and
Malcolm L. Tanner, Asst. U. S. Atty.,
Birmingham, Ala., and Charles Mehaffy,
John F. Murray and Thomas A. Frazier,
Jr., Dept. of Justice, Washington, D. C.,
for defendant.

LYNNE, Chief Judge.

Upon consideration of the pleadings,
the stipulations, the evidence adduced up-
on trial, and the briefs of the parties,
the Court makes the following Findings
of Fact and Conclusions of Law:

## FINDINGS OF FACT

*Jurisdiction; Parties; Assessment
and Collection of Taxes;
Claims for Refund*

### 1.

Plaintiff, United States Pipe & Foun-
dry Company, is a New Jersey corpora-

tion having its principal office in Birmingham, Alabama.

**2.**

On October 31, 1952, Sloss-Sheffield Steel and Iron Company (hereinafter referred to as "Sloss"), a New Jersey corporation, was duly merged into plaintiff by appropriate corporate proceedings taken in accordance with the laws of the State of New Jersey. Plaintiff, by operation of law, succeeded to all rights and became subject to all liabilities of Sloss as a consequence of such statutory merger. Until such merger, Sloss had its principal office in Birmingham, Alabama.

**3.**

Defendant George D. Patterson has been District Director of Internal Revenue for the District of Alabama since November 20, 1952. Defendants Mortimer Jordan and William E. Davis were Collectors of Internal Revenue for the District of Alabama from January 1, 1948, to November 8, 1948, and from April 1, 1949, to November 19, 1952, respectively. Arthur Sartain was Acting Collector of Internal Revenue for the District of Alabama from November 9, 1948, to March 31, 1949. Arthur Sartain died on February 10, 1954, in Jefferson County, Alabama, and no executor or administrator of his estate was appointed. All the assets of his estate have been distributed to defendants Mrs. Arthur Sartain, his widow, or to Alfred N. Sartain, his son. All defendants are residents of Jefferson County, Alabama, within the Southern Division of the Northern District of Alabama.

**4.**

The plaintiff and its predecessor Sloss during the years 1947 through 1957 maintained their respective books of account and reported their respective incomes for federal income and excess profits tax purposes on the accrual basis, and on the basis of a taxable year ending on December 31 of each year, except for the taxable year of Sloss ending on October 31, 1952.

**5.**

Within the time provided by law, Sloss filed with the Collector or District Direc-tor of Internal Revenue for the District of Alabama its Federal income and excess profits tax returns for the years 1947 through 1951 and for the taxable year, January 1, 1952, to December 31, 1952, and plaintiff filed such returns for the years 1952 through 1957 with the District Director of Internal Revenue; each duly paid the amounts shown as due thereon within the time provided by law to the then Collector or District Director of Internal Revenue in Birmingham. The amounts so paid and the dates of payment are set forth in Paragraphs 3 and 4 of the stipulation signed by the parties on November 29, 1961, and such paragraphs are incorporated herein by reference and made a part hereof.

**6.**

The Commissioner of Internal Revenue (hereinafter referred to as the "Commissioner") caused to be examined Sloss' income and excess profits tax returns for the years 1947 through 1951 and for the taxable year January 1, 1952, to October 31, 1952, and plaintiff's income and excess profits tax returns for the years 1952 to 1957 inclusive. The results of such examinations were set forth in various Revenue Agents' reports which recommended overassessments and deficiencies of income and excess profits tax for the various years. Plaintiff paid the deficiencies recommended by these reports, together with interest thereon, and received refunds or credits of the overassessments recommended by such reports, together with interest thereon, each on the dates and in the amounts set forth in Paragraph 6 of the stipulation signed by the parties hereto on November 29, 1961; such paragraph is incorporated herein by reference and made a part hereof.

**7.**

Plaintiff has filed claims for refund for each year here involved on each ground on which it seeks to recover taxes and interest paid with respect to such year. The parties have stipulated that all such claims for refund were timely filed, except that defendants contend that claims

filed by plaintiff during the year 1958 as to the years 1947 through 1953 (including Sloss' taxable year beginning January 1, 1952, and ending October 31, 1952) were timely only as to any tax and interest paid within two years before the date of filing of such claims for refund. (See Paragraph 71, infra.) The parties have also stipulated that this action was begun as to each year within two years after any denial of claims for refund filed with respect to such year and that it was begun as to each year more than six months after filing the claims for refund setting forth the grounds on which plaintiff seeks to recover for that year.

### Nature of Business

8.

Prior to its merger with plaintiff at the end of October, 1952, Sloss was engaged in the following business activities:

(a) It operated four underground coal mines, called Bessie, Flat Top, Lewisburg, and Kimberly, together with a coal washer at each mine. All were located in Jefferson County. Most of the coal mined was used by Sloss in the production of coke. The Lewisburg mine was closed in March 1951 and the Kimberly mine was closed in April 1952; no coal has been extracted by Sloss or plaintiff from these mines since these dates.

(b) It operated two underground red iron ore (hematite) mines, called Sloss and Ruffner, in Jefferson County. Sloss used the red iron ore from these mines in its blast furnaces.

(c) It operated various open pit mines from which it extracted brown iron ore (limonite) in the vicinity of Russellville, Alabama. It owned or leased additional open pit mines in this area and in the Tait's Gap area which were operated by miners under written agreements. Sloss used the brown iron ore which it mined, as well as most of such ore mined by miners under written agreements on its land, in its blast furnaces.

(d) It owned a dolomite quarry in the city of Birmingham from which miners under written agreements quarried dolomite which Sloss used as a flux stone in its blast furnaces.

(e) It operated a coke plant in the city of Birmingham at which it produced furnace and foundry coke, coke breeze, and coke by-products. Until 1951, the coke plant had 120 slot-type, by-product coke ovens; in 1951, the number was increased to 150. It sold all the foundry coke and a small amount of the furnace coke produced; the rest of the furnace coke was used in its blast furnaces. Some of the coke breeze was burned for steam and the rest was sold. It sold the coke by-products produced, including coal tar, ammonium sulfate, benzene, toluene, xylene, napthalene, and oven gas (part of which was sold and part of which was burned as fuel at the coke plant).

(f) It operated four blast furnaces in the city of Birmingham, two of which were located at its "City Furnace Plant" and two of which were located at its "North Birmingham Plant." It produced pig iron in these furnaces and, at North Birmingham, it also produced ferromanganese until July 31, 1950, when the ferromanganese business was abandoned. It sold all the pig iron and ferromanganese produced. Of the slag produced (both bank run and granulated), it sold a portion and used the rest either in a ready-mix concrete business it conducted or in a rock wool insulation plant which it operated. It produced over 30 grades of merchant pig iron, including every commercial grade used in this country.

(g) It operated a railroad, called the Mary Lee, which ran from the coal washers at Flat Top and Lewisburg to its coke plant in Birmingham.

(h) It owned land on which contractors cut timber which Sloss used in its business.

9.

During the years here involved, plaintiff was engaged in the following business activities:

(a) It operated plants at Birmingham and Bessemer, Alabama, Chattanooga, Tennessee, Burlington, New Jersey, and

since 1951, Decoto, California. It manufactured cast iron pipe at all of these plants except Chattanooga, where it manufactured cast iron fittings. It also operated a commercial foundry at the Bessemer plant and manufactured steel tubes, rolls, and similar products at the Burlington plant.

(b) After its merger with Sloss at the end of October 1952, plaintiff continued all the business activities set forth in Paragraph 8, supra, which Sloss conducted at the time of the merger. In 1953, the Ruffner red iron ore mine was closed. In 1956, the number of coke ovens was increased from 150 to 180. Plaintiff continued to sell foundry coke and pig iron, but also used substantial quantities of such foundry coke and pig iron at its own plants listed in subparagraph (a), supra

*Coal*

10.

(a) On its tax returns for the years 1948 through 1953, Sloss and the plaintiff used the following representative market prices per ton of coal which it mined:

| Year | Market Price |
| --- | --- |
| 1948 | $6.206964 |
| 1949 | 6.287972 |
| 1950 | 6.309761 |
| 1951 | 6.25000 |
| 1952 | 6.11 |
| 1953 | 6.201 |

On its return for 1947, Sloss claimed an estimated depletion deduction of $600,000 for its coal and iron ore; the return did not contain any computation of depletion. However, the claim for refund for the year 1947 filed in 1955 shows a computation by the taxpayer of $5.424393 per ton of coal mined by the taxpayer in 1947. On its return for its taxable year ended October 31, 1952, Sloss did not claim any percentage depletion for coal. On its returns for 1954 through 1957, plaintiff used the proportionate profits method to compute its percentage depletion deduction for coal.

(b) As to each year here involved, the Revenue Agent found that Sloss and plaintiff's percentage depletion deduction must be computed by reference to a "representative market or field price." For 1947, the Revenue Agent accepted as a market price the figure used on the plaintiff's claim for refund for the year 1947. For the years where the returns showed a market price (1948 through 1953) the Revenue Agent accepted the price used on the returns. As to 1954 and 1955, the Revenue Agent found only that the selling price of coking coal in the area was less than plaintiff's costs of production. For 1956, the Revenue Agent determined a representative market price of from $6.45 to $6.88 per ton and, for 1957, from $6.88 to $7.00 per ton.

(c) The deductions for percentage depletion allowed by the Agent as to coal were as follows:

| Sloss: | 1947 | $284,959.76 |
| --- | --- | --- |
| | 1948 | 193,406.55 |
| | 1949 | 56,861.25 |
| | 1950 | 304,844.17 |
| | 1951 | 241,308.21 |
| 1–1–52 to 10–31–52 | | 25,637.52 |
| Plaintiff: | 1952 | $ 5,960.64 |
| | 1953 | 33,417.70 |
| | 1954 | None |
| | 1955 | None |
| | 1956 | 50,620.66 |
| | 1957 | 303,773.11 |

For 1954 and 1955 the Revenue Agent allowed unit (cost) depletion in the respective amounts of $14,030.78 and $18,617.22.

11.

There are four coal fields in the State of Alabama: Warrior, Cahaba, Coosa, and Plateau. Only bituminous coal is found in these fields. The Warrior field, lying northwest, west and southwest of Birmingham, covers most of the drainage basin of the Warrior River in Tuscaloosa, Jefferson, Walker, Marion, Cullman, and Winston Counties, and the southern part of Blount County. Ninety-nine per cent of the coal which has been coked in the Birmingham area has come

from the Warrior field, which is adjacent to Birmingham. The Cahaba field lies generally south and east of Birmingham, and some coal from this field has been used for coke. The only coal used for coke during the years here involved from the Plateau field was mined by the Robbins Coal Company which shipped all of its production of coal for coking, unwashed, under contract to Sheffield Steel Division of Armco Steel Company in Texas. The coal in the Coosa field has high ash and high sulfur which preclude its use for coke.

### 12.

All coal mined by Sloss and plaintiff has come from the Warrior field. The Bessie, Flat Top, and Lewisburg mines are on the Mary Lee seam in that field. During the years here involved, the coal mined at the Kimberly mine came from the Jefferson seam in the Warrior field. Plaintiff, however, does not contend that it is entitled to any additional percentage depletion with respect to such Jefferson coal.

### 13.

The coal mined by Sloss and plaintiff was carried out of the mines to the washers which adjoin the mines in mine cars and there was broken, cleaned, sized, and loaded for shipment.

### 14.

The Bessie, Flat Top, and Lewisburg mines are located 26.4, 24.97, and 6.3 miles, respectively, from plaintiff's coke oven plant. During the years here involved, the coal from the Flat Top and Lewisburg mines was shipped from such mines to the coke oven plant over the company-owned Mary Lee railroad, and the coal from the Bessie mine was so shipped by common carrier (the Southern Railway Co.).

### 15.

The coke producers in the Birmingham area have always depended upon coking coal from the Warrior field as the primary ingredient of their furnace coke and foundry coke. Therefore, these producers have taken care to acquire adequate reserve supplies of this coal for current and future utilization. The principal known reserves of coal in Alabama which could be coked for commercial foundry coke or to make blast furnace coke during the period 1947 through 1957, are owned by the six coke producers who mine their own coal and operate in Alabama, namely: Sloss and, subsequently, plaintiff; United States Steel Corporation (T.C.I. Division); Republic Steel Corporation; Woodward Iron Company; Alabama By-Products Corporation; and DeBardeleben Coal Corporation. Except for DeBardeleben, the above-mentioned companies generally utilized the coking coals which they mined to meet their own requirements and did not generally offer such coal for sale to other purchasers. During the years 1947 through 1957, there were no coking coal reserves in the Warrior coal field not owned by the coke producers which were of sufficient size at any location to justify opening a new mine of the size and type operated by the furnace companies in the Birmingham district.

### 16.

(a) Alabama coals may be classified by quality as follows:

(1) A coking coal which is so constituted chemically, petrographically, and physicaly that it will produce a commercially satisfactory coke when coked under standard coking procedures.

(2) A coal which has certain chemical, physical, and petrographic characteristics that when blended with a coking coal such as that described above and/or certain other coking coals will produce a commercially satisfactory coke when coked under standard coking procedures.

(3) A coal which cannot be used in making coke due to lack of coking characteristics.

Only a Class (1) coal can be used to make a satisfactory coke by itself. Similarly, only Class (1) and Class (2) Alabama coals can be used in the making of a commercially satisfactory coke.

(b) A "Class (1)" coal is sometimes referred to as a "primary" or "basic"

coking coal and a "Class (2)" coal, as a "blending" coal. As mined, in certain areas, the Mary Lee and the Pratt can each be coked alone to produced a satisfactory blast furnace coke. Much of the Mary Lee coal mined by Sloss and plaintiff from each of their mines, Bessie, Flat Top, and Lewisburg, is a Class (1) or primary coking coal. Mary Lee coal was used alone by Sloss and the plaintiff only on special occasions. The general practice was to blend the Mary Lee coal with purchased coal to produce a satisfactory blast furnace coke. All other coking coals in the Birmingham area (including the Blue Creek, Black Creek, and Brookwood seams of the Warrior field and the Woodstock seam of the Cahaba field) are Class (2) or blending coals.

### 17.

(a) The quality of a blast furnace coke is judged on the basis of how much iron can be produced with it in the blast furnace and how much coke is required per ton of iron. The performance of a coke in the blast furnace depends on both its chemical and physical characteristics. These chemical and physical characteristics of the coke depend on certain inherent characteristics of the coal from which it is produced.

(b) Chemically, a coke should have low ash and low sulfur. Ash is undesirable in coke; it decreases the amount of carbon in the coke and it is the carbon in the coke which supplies the heat required in the blast furnace to effectuate the chemical reactions which occur. Also, some of the carbon in the coke is required to smelt the ash in the coke; thus, higher ash not only decreases the amount of carbon in the coke, but also further decreases the amount of carbon available to supply heat for the other reactions in the furnace. Sulfur in coke is undesirable because sulfur is highly undesirable in pig iron and must be kept to the lowest possible amount. If the sulfur in the coal is too high, it will prevent the use of the coking coal for coking purposes. Even if the sulfur is within permissible limits, it is still undesirable because its presence requires more flux stone to remove it from the iron; the use of this additional flux stone, of course, increases the cost of operating the blast furnace.

(c) Physically, a coke should be strong enough at high temperatures to bear the weight of hundreds of tons of material above it in the blast furnace. If the coke will not stand this weight, it disintegrates into fines. These fines impede the flow through the furnace of carbon monoxide gas which reduces the iron oxide in the ore to metallic iron. If this carbon monoxide cannot perform this function, referred to as "indirect reduction", then the reduction of the ore is accomplished through "direct reduction" by carbon in the coke with a great loss of heat and efficiency. Furthermore, fines from the coke may impede the downward flow of molten iron and slag; if this occurs, iron production will be reduced and repairs may be required if the molten iron and slag accumulate above the hearth and burn the cooling members of the furnace.

(d) Alabama coking coals differ in their chemical analyses, i. e., the amounts of fixed carbon, volatile matter, sulfur and ash in the coking coal. The physical structure and strength of coke made from Alabama coking coals also varies with the seam of coal being used.

(e) Chemically, coke made from the Mary Lee coal has higher ash but lower sulfur than that made from the Pratt. Chemically, the Pratt coal is of more value. The plaintiff's Mary Lee coal had too high ash to meet the specifications for foundry coke during 1952 through 1955, so no Mary Lee coal was used by the plaintiff for foundry coke during that period. During the other years here involved plaintiff and Sloss used Mary Lee coal as only a very small percentage of the blend for its foundry coke. With respect to Mary Lee coal generally, its utility for foundry coke was extremely limited and Alabama By-Products Corporation ceased using any Mary Lee coal for foundry coke in 1958, because it was too high in ash and sulfur.

### 18.

(a) During the period 1947 through 1957, sales of Mary Lee coking coal were made by Alabama By-Products Corporation during the years 1949 through 1954. Many of such sales were made at a price below Alabama By-Products' cost of production; they were made in order to enable the company to spread its fixed overhead and to enable it to operate its mines more days a week so that it could keep its experienced miners. The coking coal sold by Alabama By-Products Corporation was essentially the same coal which it coked.

(b) During the period 1947 through 1957, the only sales of Pratt coking coal were made by Davidson Coal Company (1947 through 1955); Brookside Pratt (1947 through 1957); and the Pratt Coal Company (1954 through 1957). The Pratt Coal Company operates a small mine on a state owned Section 16. When the company began operating this mine, its reserves were approxmiately 2,000,000 tons; the annual capacity of the mine is about 150,000 tons. The mine has one opening and the coal is loaded in the mine by hand. Because of its limited reserves, it would not have been feasible to enlarge the mine so as to increase its production. The mine has no rail connection and, to transport coal to Birmingham, must rely on trucks.

### 19.

During all the years here involved, the coal carbonized by taxpayer was Mary Lee coal from its Bessie, Flat Top, and Lewisburg mines, together with coking coal from the Jefferson seam, which was blended with Mary Lee and purchased coal used in the manufacture of furnace and foundry coke. The tons of such coal coked in each year were as follows:

| | Furnace Coke | | Foundry Coke | | |
| | Mary Lee Seam* | Jefferson Seam** | Mary Lee Seam* | Jefferson Seam** | Total |
|---|---|---|---|---|---|
| 1947 | 682,216 | 50,282 | 11,503 | – | 744,001 |
| 1948 | 672,441 | 73,876 | 7,122 | 1,323 | 754,762 |
| 1949 | 553,952 | 69,100 | 10,017 | 4,081 | 637,150 |
| 1950 | 607,881 | 103,856 | 5,170 | – | 716,907 |
| 1951 | 688,744 | 120,381 | 1,057 | 9,012 | 819,194 |
| 1952 | 709,494 | 32,111 | – | 6,675 | 748,280 |
| 1953 | 631,076 | 5,100 | – | 6,521*** | 642,697 |
| 1954 | 616,347 | – | – | – | 616,347 |
| 1955 | 794,531 | – | – | – | 794,531 |
| 1956 | 925,841 | – | 19,858 | – | 945,699 |
| 1957 | 899,367 | – | 54,132 | – | 953,499 |
| | 7,781,890 | 454,706 | 108,859 | 27,612 | 8,373,067 |

*Bessie, Flat Top and Lewisburg mines.
**Kimberly mine.
***The Kimberly mine was closed in April 1952; coal from this mine used in 1953 was stockpiled before the closing of the mine.

———◆———

### 20.

(a) During the years 1947 through 1955, Sloss and the plaintiff sold some of the Mary Lee coal which they mined. A portion of this coal was sold for fuel and the rest for coking purposes. Some of this coal was referred to as "secondary coal" because of its high ash content. However, this coal had coking qualities and when the plaintiff's sales declined in 1951 plaintiff in fact coked this coal. The coal which was sold during the years

1947 through 1955 was sold in arm's length transactions and the prices at which sold were negotiated between the plaintiff and Sloss and the purchasers. Some of the Mary Lee coal which was sold by the plaintiff was purchased by Woodward Iron Company, Republic Steel Corporation and DeBardeleben and could have been coked by the purchasers.

(b) The tons of coal sold by Sloss and plaintiff during the years here involved were as follows:

| | 1947 | | 1948 | |
|---|---|---|---|---|
| | Tons | Avg. Price | Tons | Avg. Price |
| Contract Sales | | | | |
| Birmingham Electric Co. | 19,312 | $5.205 | 25,701 | $6.046 |
| Lone Star Cement Co. | 9,235 | 5.453* | 12,405 | 6.294 |
| Lehigh Portland Cement Co. | 12,841 | 5.491 | 12,025 | 6.246 |
| Alpha Portland Cement Co. | 6,154 | 5.064 | 10,200 | 6.239 |
| "Spot" Sales | | | | |
| Solvay Process Co. | 173 | 5.172 | | |
| Seneca Coal Co. | 9,368 | 6.250 | | |
| C. W. Henley & Co. | 1,214 | 6.350 | | |
| Alabama Fuel & Iron Co. | 12,696 | 5.000 | | |
| City Board of Education | | | 374 | 6.670 |
| Misc. Cash Sales | 8,693 | 6.101 | 8,368 | 6.904 |
| Sales to Employees | 6,812 | 5.528 | 6,765 | 5.784 |

*In addition, 1794 tons of coal purchased from Alabama Fuel & Iron Co. for fuel were sold at an average price of $5.038 per ton.

| | 1949 | | 1950 | |
|---|---|---|---|---|
| | Tons | Avg. Price | Tons | Avg. Price |
| Contract Sales | | | | |
| Birmingham Electric Co. | 23,276 | $6.383 | 2,676 | $6.601 |
| Lone Star Cement Co. | 10,086 | 6.560 | | |
| "Spot" Sales | | | | |
| Republic Steel Corp. | 18,118 | 6.350 | | |
| Berman Bros. | 108 | 6.516 | | |
| Woodward Iron Co. | 17,571 | 6.713 | | |
| DeBardeleben Coal Co. | | | 105 | 5.986 |
| Misc. Cash Sales | 2,980 | 7.228 | 1,731 | 7.195 |
| Sales to Employees | 4,095 | 6.509 | 3,692 | 5.997 |

| | 1951 | | 1952 | |
|---|---|---|---|---|
| | Tons | Avg. Price | Tons | Avg. Price |
| Contract Sales | – | – | – | – |
| "Spot" Sales | – | – | – | – |
| Misc. Cash Sales | 1,456 | $7.244 | 189 | $7.333** |
| Sales to Employees | 3,333 | 5.789 | 1,460 | 6.116 |

** In addition 8 tons of purchased coal were sold at an average price of $6.891.

Note: After 1952 no sales were made except to employees. The following sales were made to employees in years after 1952:

| | Tons | Avg. Price |
|------|------|-----------|
| 1953 | 549 | $6.227 |
| 1954 | 627 | 6.218 |
| 1955 | 294 | 6.061 |
| 1956 | None | None |
| 1957 | None | None |

All of the coal sold after 1952 was sold to employees pursuant to union contract at cost without the allocation of any overhead or general office expense.

(c) When these sales fell off, Sloss and plaintiff for a time wasted the high ash coal they could not sell. Then they installed additional washing equipment (including heavy media and flotation equipment) to separate out and recover as much coal as could be used for coke, from the high ash coal which had previously been sold.

**21.**

(a) During the years in suit, Sloss and plaintiff also purchased coking coal to blend its Mary Lee and Jefferson coking coals to produce both furnace and foundry coke.

(b) The coking coal purchased came principally from the Pratt, Blue Creek, Black Creek and Woodstock seams in Alabama and the Pocahontas seam in West Virginia. The tons of purchased coking coal used for furnace coke and foundry coke in each year were as follows:

| Year | Furnace Coke | Foundry Coke | Total |
|------|-------------|-------------|---------|
| 1947 | 160,290 | 75,094 | 235,384 |
| 1948 | 138,392 | 74,881 | 213,273 |
| 1949 | 118,328 | 67,882 | 186,210 |
| 1950 | 178,468 | 37,945 | 216,413 |
| 1951 | 141,423 | 43,610 | 185,033 |
| 1952 | 268,840 | 65,253 | 334,093 |
| 1953 | 346,278 | 50,315 | 396,593 |
| 1954 | 193,689 | 97,647 | 291,336 |
| 1955 | 86,931 | 166,048 | 252,979 |
| 1956 | 137,191 | 143,841 | 281,032 |
| 1957 | 144,515 | 90,618 | 235,133 |

---

(c) The weighted average prices for coking coals purchased by plaintiff and/or Sloss referred to above in subparagraph 21(b) were as follows:

| Year | Alabama Coals | Out of State Coals | All Coals |
|------|--------------|--------------------|-----------|
| 1947 | $5.44 | $4.51 | $5.41 |
| 1948 | 6.40 | 6.57 | 6.41 |
| 1949 | 6.26 | 6.56 | 6.28 |
| 1950 | 6.24 | 7.03 | 6.30 |
| 1951 | 6.23 | 5.92 | 6.21 |
| 1952 | 5.92 | 6.01 | 5.93 |
| 1953 | 6.14 | 5.88 | 6.13 |
| 1954 | 6.13 | 5.27 | 5.91 |
| 1955 | 5.99 | 5.04 | 5.84 |
| 1956 | 6.21 | 6.47 | 6.25 |
| 1957 | 6.40 | 7.06 | 6.51 |

### 22.

(a) Alabama coal production is also classifiable by the type operation which produces it, *viz.,* according to coal production by:

(1) Captive operations;

(2) Controlled operations;

(3) Commercial operations.

(b) *Captive operation* coal is mined on land owned by the integrated companies, used to meet their own requirements and not generally offered for sale in a public market.

(c) *Controlled operation* coal is mined under contract or other corporate arrangement which precludes its sale in a public market or otherwise makes it unavailable as an assured or regular source of supply.

(d) *Commercial operation* coal is mined by an operator for sale to others and over the disposition of which the operator retains full control.

(e) Controlled operations exhibit two types of control, *viz.:*

(1) Production of coal which is committed to a particular purchaser under long-term contracts which withdraw such production from market availability; and,

(2) Operations by commercial operators on land leased from one of the integrated companies, subject to the provisions of the respective leases.

### 23.

(a) Substantially all of the coking coal mined in Alabama was used in Alabama; thus, the U. S. Bureau of Mines reports that only the following amounts of such coal were shipped out of the state (to Texas) for coking:

| | |
|---|---|
| 1947 | 7,408 |
| 1948 | 109,375 |
| 1949 | 101,992 |
| 1950 | 210,836 |
| 1951 | 174,867 |
| 1952 | 95,537 |
| 1953 | 86,375 |
| 1954 | 84,349 |
| 1955 | 94,984 |
| 1956 | 120,104 |
| 1957 | 149,871 |

(b) Also, substantially all of the coal carbonized in Alabama was mined in Alabama; of the total coal received at coke plants in Alabama for carbonization, the following amounts were mined in Alabama and in other states, as reported by the U. S. Bureau of Mines:

| Year | Tons Mined in Alabama | Tons Mined in Other States | Percentage Mined in Alabama |
|---|---|---|---|
| 1947 | 8,247,642 | 122,750 | 98.5 |
| 1948 | 8,712,950 | 164,015 | 98.2 |
| 1949 | 6,963,921 | 142,029 | 98.0 |
| 1950 | 8,662,520 | 270,735 | 97.0 |
| 1951 | 8,766,793 | 271,653 | 97.0 |
| 1952 | 7,426,382 | 187,472 | 97.5 |
| 1953 | 8,203,146 | 189,817 | 97.7 |
| 1954 | 6,823,642 | 183,617 | 97.4 |
| 1955 | 8,246,518 | 446,809 | 94.9 |
| 1956 | 7,478,290 | 462,325 | 94.2 |
| 1957 | 8,004,201 | 385,726 | 95.4 |

### 24.

During these years, the total tons of coal actually carbonized in Alabama, as reported by the Bureau of Mines, and the tons carbonized by Sloss and plaintiff were as follows:

| Year | All Companies | Coal Carbonized U. S. Pipe | U. S. Pipe % |
|------|---------------|----------------------------|--------------|
| 1947 | 8,281,171 | 979,385 | 11.827 |
| 1948 | 8,410,868 | 968,035 | 11.509 |
| 1949 | 7,282,457 | 823,360 | 11.306 |
| 1950 | 8,221,235 | 933,320 | 11.353 |
| 1951 | 8,756,422 | 1,004,227 | 11.468 |
| 1952 | 8,269,788 | 1,082,373 | 13.088 |
| 1953 | 9,001,423 | 1,039,290 | 11.546 |
| 1954 | 7,265,403 | 907,683 | 12.493 |
| 1955 | 8,539,610 | 1,047,510 | 12.266 |
| 1956 | 7,879,210 | 1,226,731 | 15.569 |
| 1957 | 8,122,192 | 1,188,632 | 14.634 |

25.

Had Sloss or plaintiff owned no coking coal reserves during the years here involved, they could not have supplied their needs therefor from Alabama. As an alternative to closing down coke oven operations they would have been required to have procured acceptable coking coals from out-of-state sources at high delivered prices which would have included substantial freight charges.[1]

26.

Mineral Year Book statistics relating to average costs of coking coals delivered at coke plants in the United States during the years involved herein have no probative value for the reason that it is impossible to determine what part of such average cost is attributable to freight rates.[2]

27.

Use of the so-called "Fiske formula" to compute "gross income from property" is inapposite under the facts as found by the court.

28.

During the years here involved, Sloss and plaintiff's average cost per ton of transporting its coal from its Mary Lee mines to its coke ovens was as follows:

| | |
|------|------|
| 1947 | $.48 |
| 1948 | .57 |
| 1949 | .67 |
| 1950 | .61 |
| 1951 | .82 |
| 1952 | .86 |
| 1953 | .91 |
| 1954 | .95 |
| 1955 | .72 |
| 1956 | .89 |
| 1957 | .94 |

29.

(a) The weighted average prices per ton of all washed coking coal sold in the

1. While there is undisputed evidence as to the replacement cost of plaintiff's coal from outside Alabama, e. g., Stipulation No. 1, paragraphs 15, 19, 21, 22, 23(a), 23(b), and plaintiff's Exhibit No. 22, which would support a finding similar to that appearing in Woodward, 173 F.Supp. at 263 and 264, the court holds that such evidence has no probative value since the representative market price of such coal in the Birmingham district has been established.

2. Understandably, counsel for plaintiff relied heavily upon the representative market or field prices for coking coals in the Birmingham area for the years 1951, 1952, and 1953 found by this court in Woodward Iron Company v. Patterson, 173 F.Supp. 251, at 264. To such prices they applied various indices computed from statistics obtained from mineral yearbooks and other sources, e. g., plaintiff's Exhibits 30, 32, 34, 36, 38 and 39, to demonstrate the range of the prices for the years in suit. This court is now convinced that it was in error in that critical finding in Woodward and that the prices arrived at therein substantially exceeded *the representative* market or field price in each year.

Birmingham district during the years 1947 through 1957, with averages reflected as to sales for coking purposes, sales for domestic purposes and sales for steam purposes, are as reflected by the following tables:

| Year | For Coking Purposes | For Domestic Purposes | For Steam Purposes | For All Purposes |
|------|------|------|------|------|
| 1947 | 5.572 | 7.036 | 5.842 | 6.04 |
| 1948 | 6.463 | 8.09 | 6.597 | 6.89 |
| 1949 | 6.345 | 8.209 | 6.175 | 6.60 |
| 1950 | 6.258 | 8.430 | 6.277 | 6.59 |
| 1951 | 6.203 | 8.650 | 6.51 | 6.87 |
| 1952 | 6.102 | 8.644 | 6.355 | 6.74 |
| 1953 | 6.226 | 8.831 | 6.204 | 7.02 |
| 1954 | 6.127 | 8.774 | 5.299 | 6.93 |
| 1955 | 5.709 | 9.130 | 6.072 | 6.67 |
| 1956 | 6.009 | 8.909 | 6.753 | 6.85 |
| 1957 | 6.087 | 9.070 | 7.386 | 7.11 |

(b) All sales and purchases shown on Stipulation No. 1, Exhibits F, G, I, J and K, were made in the open market for commercial usages by substantial, independent, companies as a result of competitive negotiations between buyers and sellers who were of approximately equal bargaining power. None were forced sales. Most of these sellers were engaged solely in the business of mining and selling coking coal on the open market.

(c) The coking coal sold on the domestic market shown in Exhibit J required substantially more beneficiation and preparation in the way of sizing, screening, and in some cases oil treatment, than that coking coal which was sold for coking purposes shown on Exhibit I.

30.

There was during the years here involved in the Birmingham district a

3. For the information of the parties and others who deal recurrently with the problem of percentage depletion allowance on coking coals in integrated operations in the Birmingham area the court prefers to explicate its reasoning in this fact finding process, though well aware that the best it can do with the mass of relevant evidence will not be considered good enough by present and future litigants.

representative market or field price per ton for coking coals of like kind and grade as the Mary Lee coking coal mined by Sloss and plaintiff and used by them in the manufacture of coke. That price was:[3]

| | |
|------|------|
| 1947 | $6.35 |
| 1948 | 6.90 |
| 1949 | 6.71 |
| 1950 | 6.73 |
| 1951 | 7.01 |
| 1952 | 6.88 |
| 1953 | 7.16 |
| 1954 | 7.07 |
| 1955 | 6.81 |
| 1956 | 6.99 |
| 1957 | 7.25 |

*Brown Iron Ore*

31.

(a) On their income and excess profits tax returns for the years 1948 through

From Finding 20(b), supra, based upon Exhibit "F" to the stipulation the court has determined that the highest average price per ton at which Sloss sold its coking coals in a competitive market in 1947 was $6.35 in the sale of 1,214 tons to C. W. Henley & Co. and in 1949 it was $6.71 in the sale of 17,571 tons to Woodward Iron Co. In 1948 the highest average price of $6.90, derived from the miscellaneous cash sales of 8,368 tons,

1957, Sloss and plaintiff computed their percentage depletion deductions for brown iron ore on the basis of the proportionate profits method. In its return for 1947, Sloss estimated the total depletion deduction for coal and iron ore and did not show a depletion computation on its return. For all years here involved, the Revenue Agent determined that there were "representative market prices" for brown iron ore.

(b) For the years 1947 through 1955, the Revenue Agent computed such prices on the basis of amounts paid by Sloss and plaintiff to Shook & Fletcher Supply Company, a brown iron ore mining company, during those years. For 1956 and 1957, the Agent computed such prices on the basis of prices at which plaintiff purchased brown iron ore from Glenwood Mining Company. Prices paid for brown iron ore varied, depending on the percentage of iron and other constituents in the ore. As an illustration, the following is the price scale in effect with Glenwood Mining Company, f. o. b. cars at plaintiff's plants in Birmingham, used by the Agent to determine the market price of plaintiff's brown iron ore from January 1, 1956, to July 31, 1956:

| Combined Iron & Manganese | Price Per Unit Per Gross Ton, Dry Basis |
| --- | --- |
| 44.00–44.99% | $.1275 |
| 45.00–46.99% | .1325 |
| 47.00–49.99% | .1375 |
| 50.00–52.99% | .1475 |
| 53.00% and over | .1500 |

A "unit per gross ton dry basis" consists of 22.4 pounds of iron and manganese combined per dry gross ton (2240 pounds) of ore. As an example, if a ton of plaintiff's dry ore contained 48.18% iron and 0.47% manganese (a total of 48.65%), the unit price would be $.1375. Since a ton would contain 48.65 units of iron and manganese combined, the delivered price of the ore would be $6.69 (48.65 times $.1375). The Agent then deducted the freight charge from plaintiff's mine to its plant to determine the market price of the ore at the mine.

(c) The Revenue Agent allowed percentage depletion deductions for brown iron ore in the following amounts:

| Sloss | | Plaintiff | |
| --- | --- | --- | --- |
| 1947 | $ 70,940.84 | 1952 | $ 6,801.02 |
| 1948 | 123,479.12 | 1953 | 98,671.82 |
| 1949 | 97,650.46 | 1954 | 74,675.02 |
| 1950 | 99,772.66 | 1955 | 52,174.20 |
| 1951 | 167,270.09 | 1956 | 155,702.96 |
| 1–1–52 to 10–31–52 | 171,009.39 | 1957 | 66,411.75 |

was allowed because, though not truly representative, it was the only price obtained by Sloss in that year equal to or in excess of the average weighted prices hereinafter discussed.

By comparing Sloss' highest price for each of these years with the weighted average price of Finding 29(a), supra, it was determined that Sloss' highest average price obtained in a competitive market exceeded the weighted average price in 1947 by 31 cents, in 1948 by 1 cent, and in 1949 by 11 cents per ton, or an average of 14 cents per ton per year. The court then proceeded to add 14 cents per ton to the average weighted price

for the years 1950 to 1957, inclusive, in none of which plaintiff had established a market price for its coking coal by sales made in a competitive market.

The search in these coal depletion cases is for market price, not for market value. Where the owner establishes a representative market price for its coal by selling substantial quantities in the market, affected by competitive bargaining and principles of supply and demand, it is entitled to the benefit thereof in computing percentage depletion on all of the coal mined by it during such year. On the other hand, if it elects to exercise its undoubted right to retain all of the

#### 32.

During the years 1947 through 1957, brown iron ore (limonite) was strip-mined at various locations in Alabama, including the Russellville area in Franklin County in northwestern Alabama, the Woodstock area some 25 miles southwest of Birmingham, the Tait's Gap area in Blount County, and certain areas in South Alabama. In addition some brown iron ore mined in Georgia and Missouri (by Shook & Fletcher Supply Co.) was sold in competition with the Alabama brown iron ore.

#### 33.

During the above period, Sloss and plaintiff obtained brown iron ore from their own open-pit mining operations in the vicinity of Russellville and from miners operating under written agreements on their properties in the Russellville and Tait's Gap areas, and in all years herein involved they purchased brown iron ore mined from other properties. They used the brown iron ore so obtained in their blast furnaces.

#### 34.

During the years here involved, Sloss and the plaintiff, Republic Steel Corporation, T.C.I. and Woodward purchased iron ore on the open market. The brown iron ore miners were independent, derived their livelihood from selling the ore, and bargained with purchasers to arrive at negotiated prices.

#### 35.

The furnace companies in the Birmingham area received their requirements of iron ore by mining it themselves, receiving it from miners who operated on the furnace companies' lands under written agreements,[4] or purchased their iron ore requirements from other independent companies who owned or leased their own mines. Some of these independent brown iron ore miners were individuals who operated relatively small plants. Others, such as Shook & Fletcher, Glenwood, and Schroeder Company were large independent producers and there were other sizable mines in the Birmingham district.

#### 36.

During the period 1947 to 1957, the brown iron ore miners negotiated the prices to be paid for the ore and when prices paid for brown iron ore increased this was sometimes due to increasing wage rates and sometimes to increased market prices for similar ore in the area.

#### 37.

There were during the years here involved in the Birmingham district representative market or field prices for brown iron ore of like kind and grade as the brown iron ore mined from the properties of Sloss and plaintiff and used by them in the manufacture of pig iron. Those prices were the amounts per dry gross ton (2240 pounds) of ore computed under the unit-price scales set out below (a "unit per gross ton, dry basis" consisting of 22.4 pounds of iron and manganese combined per dry gross ton of ore), increased for 1947 and 1948 by three cents per dry gross ton of ore,[5] and decreased for all other years by the

coal it mines for use in its integrated manufacturing processes because its intrinsic characteristics impart some added value in the uses to which it is put, this court is of the firm opinion that the best evidence of its representative market price is the weighted average prices of all coal of like kind and grade sold in the district during the year involved. (Defendant's Exhibit 8, with the unwashed coal taken out, incorporated in Finding No. 29(a), supra.)

4. Pertinent provisions of such written agreements to which Sloss or plaintiff were parties appear in Findings 66 to 70, inclusive, infra.

5. The price scales for 1947 and 1948 are the highest in effect for each year under the agreement between Sloss and Shook & Fletcher Supply Company for the mining of ore by the latter from properties of Sloss in Franklin County, as set out in exhibits to the stipulation of the parties signed and filed on November 29, 1961. The addition of three cents per ton to the price computed under these price scales adjusts for the fact that Sloss paid the Alabama severance or tonnage tax of 3 cents per ton on ore mined by Shook & Fletcher and delivered to Sloss under this agreement during 1947 and 1948. Shook & Fletcher Supply Company did

freight charges from the mine washer to plaintiff's Birmingham furnace plants which were applicable in the case of brown iron ore delivered to plaintiff under the price scales used, as explained in the margin.[6]

Percentage of Combined
Iron & Manganese, Dry
Analysis

| Year | 42–44.99 | 45–46.99 | 47–49.99 | 50–51.99 | 52–53.99 | 54 and over |
|------|----------|----------|----------|----------|----------|-------------|
| | Price per Unit per Gross Ton, Dry Basis | | | | | |
| 1947 | $.0400 | $.0600 | $.0635 | $.0675 | $.0700 | $.0725 |
| 1948 | .0500 | .0700 | .0735 | .0775 | .0800 | .0825 |

Percentage of Combined
Iron & Manganese, Dry
Analysis

| Year | 40–44.99 | 45–46.99 | 47–51.99 | 52–52.99 | 53 and over |
|------|----------|----------|----------|----------|-------------|
| | Price per Unit per Gross Ton, Dry Basis | | | | |
| 1949 | $.0950 | $.0975 | $.1000 | $.1050 | $.1075 |
| 1950 | .1100 | .1125 | .1150 | .1175 | .1200 |

Percentage of Combined
Iron & Manganese, Dry
Analysis

| Year | 40–44.99 | 45–46.99 | 47–49.99 | 50–52.99 | 53 and over |
|------|----------|----------|----------|----------|-------------|
| | Price per Unit per Gross Ton, Dry Basis | | | | |
| 1951 | $.1300 | $.1325 | $.1350 | $.1375 | $.1400 |
| 1952 | .1300 | .1325 | .1350 | .1375 | .1400 |
| 1953 | .1300 | .1325 | .1350 | .1375 | .1400 |
| 1954 | .1300 | .1325 | .1350 | .1375 | .1400 |
| 1955 | .1300 • | .1325 | .1350 | .1375 | .1400 |
| 1956 | .1425 | .1475 | .1525 | .1625 | .1650 |
| 1957 | .1325 | .1375 | .1425 | .1525 | .1550 |

not pay to Sloss any royalty with respect to such ore, but contrary to plaintiff's contention the court has determined not to add an additional 25 cents per ton as royalty to the price computed under the price scales.

6. Although the price scales used for 1947 and 1948 are f. o. b. cars at the mine washer, those used for later years are f. o. b. cars at plaintiff's Birmingham furnace plants and are the highest price scales in effect for each year for brown iron ore shipped by Shook & Fletcher Supply Company from its mine washer in Blount County to the Birmingham plants of Sloss or plaintiff except in the case of 1950, for which the highest scale in effect during the year for brown iron ore shipped by Shook & Fletcher Supply Company from its Warner mine washer in Franklin County to Sloss' Birmingham plants is used. The freight charges to be deducted in arriving at the representative market price of brown iron ore at the mine washer thus are the freight charges from the Warner washer of Shook & Fletcher Supply Company in Franklin County (Russellville) to Sloss' Birmingham plants for 1950 and the freight charges from Shook & Fletcher Supply Company's washer in Blount County to the Birmingham plants of Sloss or plaintiff for 1949 and for 1951 through 1957, inclusive.

*Red Iron Ore*

**38.**

(a) On their income and excess profits tax returns for the years 1948 through 1957, Sloss and plaintiff computed their percentage depletion deductions for red iron ore on the basis of the proportionate profits method. In its return for 1947, Sloss estimated the total depletion deduction for coal and iron ore and did not show a depletion computation on its return. For all years here involved, the Revenue Agent accepted the proportionate profits method. For the years 1954 through 1957, the Revenue Agent allowed plaintiff percentage depletion deductions for red iron ore in the following amounts:

| | |
|---|---|
| 1954 | $204,261.84 |
| 1955 | 165,759.17 |
| 1956 | 255,777.58 |
| 1957 | 245,201.64 |

(b) By affirmative defense filed in this action the Government has put the taxpayer's right to use the proportionate profits method with respect to red iron ore in issue for the years 1954 through 1957 only, as a set-off against any recovery by the plaintiff for those years on other issues. The Government contends that the entire amounts allowed by the Revenue Agent, as percentage depletion for plaintiff's red iron ore for the years 1954, 1955, 1956 and 1957 were excessive.

**39.**

During the years 1954 through 1957, the plaintiff mined hard red iron ore (hematite) from its Sloss underground mine located on Red Mountain near Bessemer and approximately 15 miles from Birmingham. The entire production of the mine was used in the plaintiff's blast furnaces in the manufacture of pig iron. The plaintiff or Sloss had also operated the Sloss mine and used the red iron ore mined there in its blast furnaces during the years 1947 through 1953.

**40.**

During the years 1954 through 1957 there were no sales of the hard red iron ore mined in Alabama. It was mined only by the four companies with blast furnace plants in the Birmingham district (plaintiff; United States Steel Corporation, T. C. I. Division; Woodward Iron Company; and Republic Steel Corporation) from their mines on Red Mountain. All of these were underground mines except for some stripping by Republic of hard red iron ore from an outcrop of the Big Seam, where the soft surface ore had been removed previously, near its Spaulding underground mine on Red Mountain.

**41.**

The hard red iron ore mined by plaintiff from its Sloss mine during the years 1954 through 1957 had a very consistent and uniform chemical analysis. The iron content was approximately 34 to 35 per cent, and it contained approximately 29 to 30 per cent of calcium carbonate (16 to 17 per cent calcium oxide). This was typical of the best Red Mountain red iron ore. The calcium carbonate in the hard red iron ore on Red Mountain serves a useful and valuable purpose in the blast furnace, performing the same function in fluxing impurities from the ore as flux stone which otherwise would have to be added to the burden and in fact performing this function better because of the intimate combination of the calcium carbonate with the gangue content throughout the ore. Some of the Red Mountain ore, including that from plaintiff's Sloss mine, contains enough calcium carbonate, or lime, to be completely self-fluxing.

**42.**

Physically, the hard red iron ore on Red Mountain is hard and compact, includes only a very small amount of fine particles, and does not break down into fines under the burden of the blast furnace.

**43.**

During the years 1954 through 1957, small quantities of soft surface red iron ore were stripped from time to time from surface outcrops by various small operators and sold to the furnace companies for limited and special-purpose

use. The calcium carbonate and much of the phosphorous have been leached out of the surface ore by surface waters, and it is quite different chemically from the hard underground red iron ore. Physically, the soft surface ore does not compare at all with the hard red ore. It is very friable and breaks into small particles or fines, is extremely sticky when wet, and turns into dust when dry. Because of these characteristics, it is difficult to handle, sticks up the blast furnace if not crushed, and if crushed breaks into fines, which are lost in the gas stream as flue dust. When purchased by the furnace companies, the soft surface ore was used as a small percentage of the furnace burden in making low-phosphorous pig iron, mainly as a source of slag volume needed to remove impurities in low-acid sinter material used as the main part of the burden. The poor physical characteristics of the soft surface ore make it an undesirable furnace material, unsuitable for use in large quantities. The plaintiff's purchases of soft surface ore, for the special purpose described, amounted to less than 10,000 tons in each of the years 1955, 1956 and 1957, and plaintiff purchased none at all in 1954. Plaintiff's purchases of soft surface ore for the entire four-year period totaled less than 20,000 tons, as compared with an annual production of approximately 200,000 tons of hard red iron ore from plaintiff's Sloss mine. In none of the years 1954 through 1957 was the annual production of soft surface ore in Alabama as much as 100,000 tons, whereas several million tons of hard red iron ore were mined by the furnace companies each year.

44.

The soft surface iron ore described above was not a mineral product of like kind and grade as the hard underground red iron ore mined by plaintiff from its Sloss mine during the years 1954 through 1957.

45.

There were sales of brown iron ore in the Birmingham district during the years 1954 through 1957. Hard red iron ore, which plaintiff mined from its Sloss mine during these years, and brown iron ore are different minerals, with a different chemical composition. Red iron ore is hematite, an anhydrous iron oxide ($Fe_2O_3$). Brown iron ore is limonite, a hydrous iron oxide. ($2Fe_2O_3.3H_2O$), which, unlike hematite contains water of crystallization chemically combined with the iron oxide in the ore. Unlike hard underground red iron ore, brown iron ore contains no calcium carbonate.

46.

Geologically, the red iron ore and brown iron ore mined in Alabama were deposited differently, and this has an important practical significance. The hematite mined on Red Mountain is a primary ore, laid down in a definite stratum as layers of rock are deposited; as a result, reserves of red iron ore can be estimated reliably, and the chemical composition of the red ore from a particular mine is quite uniform. On the other hand, brown iron ore is a secondary mineral and is found in Alabama in irregular and widely scattered deposits, so that it is much more difficult to prospect and mine than red iron ore and has a widely varying chemical composition, even in an individual mine.

47.

Red iron ore and brown iron ore also differ greatly in physical characteristics. Unlike the hard red iron ore from the underground mines on Red Mountain, brown iron ore is soft, porous, includes a high percentage of fine particles which are undesirable from the standpoint of efficient blast furnace operation, and tends to break down further into fine particles in the blast furnace.

48.

During the period 1947 through 1957, brown iron ore supplied only about 10 or 15 per cent of the ore material used in blast furnaces in the Birmingham district. Red iron ore from the underground mines on Red Mountain was the principal type of ore used in the district during

that period and has been since about 1880, when it was first found that the hard red ore could be used in the blast furnace with coke as a fuel and when the development of a major iron and steel production center in the Birmingham district began.

### 49.

The widely varying chemical composition of brown iron ore causes erratic furnace operation when a high percentage of brown iron ore is used in the burden. These difficulties can be controlled only to a limited degree and only by extensive chemical analysis and blending procedures which are expensive and are not necessary with hard red iron ore and by changes in blast furnace practice which reduce the production of pig iron and are not as efficient as the practices with red iron ore.

### 50.

The iron content of brown iron ore mined in Alabama ranges generally from approximately 45 per cent to 52 per cent, with very little over 52 per cent and averages 47 to 48 per cent. Although this is higher than the iron content of the hard red iron ore mined by plaintiff during the years 1954 through 1957, iron ore cannot be evaluated on the basis of metallic content alone. Other factors, such as physical characteristics, are very important.

### 51.

The brown iron ore mined and sold in Alabama during the years 1954 through 1957 was not a mineral product of like kind and grade as the hard red iron ore mined by plaintiff from its Sloss mine during the years 1954 through 1957.

### 52.

There was not during the years 1954 through 1957, inclusive, in the Birmingham district representative market or field prices for iron ore of like kind and grade as the hard red iron ore mined by plaintiff during those years from its Sloss mine and used by it in the manufacture of pig iron.

### Dolomite

### 53.

(a) On their returns for the years 1951 through 1957, Sloss and plaintiff computed their percentage depletion deductions for dolomite on the basis of the proportionate profits method.

(b) For the years 1951 through 1953, the Revenue Agent did not take exception to the use of the proportionate profits method and allowed depletion deductions for dolomite based on that method in the following amounts:

Sloss

| | |
|---|---|
| 1951 | $27,160.18 |
| 1-1-52 to | |
| 10-31-52 | 21,016.98 |

Plaintiff

| | |
|---|---|
| 1952 | $ 4,330.04 |
| 1953 | 28,005.89 |

For the years 1954 through 1957, the Agent determined that there were representative market prices for dolomite which were lower than plaintiff's costs of mining; as a result, he allowed no depletion deduction for dolomite because of the limitation of the percentage depletion allowance to 50 per cent of taxable income from the property. In his report for 1954 and 1955, the Agent used $1.50 and $1.55, respectively, as the representative market prices for plaintiff's dolomite for those two years. For 1956 and 1957, the Agent found that the "representative market value" of the dolomite produced was less than plaintiff's cost of production, but he did not determine what the representative market price was. The depletion deductions for dolomite claimed by plaintiff on its returns for the years 1954 through 1957 and disallowed in full by the Agent were as follows:

| | |
|---|---|
| 1954 | $24,032.86 |
| 1955 | 35,705.04 |
| 1956 | 35,803.98 |
| 1957 | 31,026.82 |

(c) By amended pleadings the Government has taken the position as an

affirmative defense of set-off, that the Revenue Agent erred in allowing the proportionate profits method with respect to dolomite for the taxable years 1951 through 1953 and that for those years the taxpayer's dolomite percentage depletion base, "gross income from the property," must be computed by reference to representative market prices for dolomite. The amounts of deductions for depletion on dolomite allowed by the Revenue Agent which the Government now alleges were excessive are as follows:

Sloss

| | |
|---|---|
| 1951 | $11,320.25 |
| 1-1-52 to | |
| 10-31-52 | 19,907.08 |
| 1952 | 4,330.04 |
| 1953 | 28,005.89 |

### 54.

The dolomite extracted from the quarry owned by Sloss or plaintiff in North Birmingham during the years 1951 through 1957, inclusive, and used by them as fluxing stone in their blast furnaces was crushed and screened to sizes $\frac{1}{4}$ inch by 4 inches. Except for "screenings" (fine particles under $\frac{1}{4}$ inch in size, which resulted from crushing the dolomite to the size used for fluxing stone and which were not suitable for use in the blast furnaces as fluxing stone), all the dolomite extracted from the quarry during said years was used by Sloss or plaintiff as fluxing stone in their blast furnaces. The annual production of dolomite flux stone from the quarry during said years averaged approximately 100,-000 tons.

### 55.

The dolomite extracted from the said quarry during said years and used by Sloss or plaintiff as blast furnace fluxing stone was composed of the mineral dolomite to the extent of 98 per cent or 99 per cent, with less than 1 per cent silica and less than 1 per cent of other impurities. It had a consistent and uniform chemical analysis averaging as follows during the years 1951 through 1957:

| | |
|---|---|
| Calcium carbonate ($CaCO_3$) | 55.60% |
| Magnesium carbonate ($MgCO_3$) | 42.86% |
| Silica ($SiO_2$) | 0.74% |
| Alumina ($Al_2P_3$) | 0.52% |
| Iron oxide ($Fe_2O_3$) | 0.26% |

The dolomite extracted from said quarry was suitable for use in quantity for metallurgical and chemical purposes.

### 56.

The only other dolomite quarries operated in Alabama during the period 1951 through 1957 were as follows:

(a) United States Steel Corporation (T. C. I. Division) and Republic Steel Corporation each operated a dolomite quarry in the Birmingham area. The dolomite produced at these quarries during the years 1951 through 1957 was of approximately the same purity as that produced during those years from the dolomite quarry owned by Sloss and plaintiff and was used as blast furnace fluxing stone by T. C. I. and Republic, which did not sell any of the dolomite produced during said period. The annual production of dolomite fluxing stone from these quarries during said period was approximately 1,000,000 tons at the T.C. I. quarry and approximately 100,000 tons at the Republic quarry.

(b) Montevallo Limestone Company operated a dolomite quarry near Montevallo, Alabama, approximately 30 miles southwest of Birmingham. This quarry was rejected by H. K. Porter Company in either 1957 or 1958 as a source of supply of high-grade dolomite for use in its plant at Pascagoula, Mississippi for the manufacture of magnesium oxide for refractories, because too many ledges in the quarry ran too high in silica to meet H. K. Porter Company's specifications of a maximum silica content of 1.25 per cent. At several places in the quarry, the silica content of the stone was well over 2 per cent, and in some places the silica content of the stone was as high as 5 per cent. The dolomite produced

from the Montevallo quarry during the years 1951 through 1957, inclusive, was used as agricultural limestone and fertilizer filler.

(c) Dolcito Quarry Company operated a dolomite quarry at Tarrant City, Alabama, just outside the city limits of Birmingham. This quarry was also rejected by H. K. Porter Company in either 1957 or 1958 as a source of supply of dolomite for the manufacture of magnesium oxide at its Pascagoula plant, because the stone ran too high in silica (from 2 per cent to well over 5 per cent) to meet H. K. Porter Company's specifications of a maximum silica content of 1.25 per cent. The insolubles content of dolomite produced from the Dolcito quarry varies generally from 1 per cent up to as high as 8 per cent and averages generally approximately 5 per cent. Some of the dolomite produced from this quarry during the period 1951 through 1957 was sold for use as agricultural stone, rock dust for coal mines, mineral filler, and road and concrete aggregates; a low silica content is not required for any of these uses. The only other product sold by Dolcito Quarry Company during said period was fluxing stone. Some fluxing stone was sold by Dolcito during said period to pipe shops, to foundries, and to one blast furnace company, Woodward Iron Company, which did not have its own dolomite quarry and which did not have to use nearly as much fluxing stone as the other Birmingham furnace companies because it used largely self-fluxing red iron ore.

### 57.

It is highly desirable for blast furnace fluxing stone to be as low in insolubles content as possible, since the amount of silica and other insolubles affects the cost of operating the furnace, and the degree of uniformity of the chemical composition of stone also has a decided effect on its usefulness as fluxing stone in the blast furnace.

### 58.

The average price per ton, f. o. b. quarry, received by Dolcito Quarry Company for dolomite produced from its quarry in each of three general product categories for each of the years 1951 through 1957 was as follows:

| Year | Agricultural Stone | Mineral Filler and Mine Dust | Crushed Stone and Aggregate |
|------|------|------|------|
| 1951 | $1.77 | $4.50 | $1.37 |
| 1952 | 1.78 | 4.50 | 1.42 |
| 1953 | 1.80 | 4.50 | 1.40 |
| 1954 | 1.78 | 4.50 | 1.38 |
| 1955 | 1.70 | 4.85 | 1.40 |
| 1956 | 1.80 | 4.50 | 1.55 |
| 1957 | 1.80 | 4.80 | 1.55 |

The agricultural stone sold was minus 8 mesh in size. The mineral filler and mine dust were very fine in particle size. The crushed stone and aggregates included products varying in size from 3½ inches down to ¼ or ⅛ inch. Approximately 10 per cent of the crushed stone sold was sold for use as fluxing stone. Dolcito was selling its dolomite in competition with other companies in the area, among which were Birmingham Slag Company, Alabama Aggregate Company, and Alabama Limestone Company. Dolcito was selling its stone for fluxing out slag in the blast furnace to Woodward Iron Company, American Cast Iron & Pipe Company, Central Foundry Company, and James Clow.

**59.**

The Court finds of no probative value evidence relating to sales of dolomite by plaintiff to H. K. Porter Company during the years 1959, 1960 and 1961.[7]

**60.**

Plaintiff purchased crushed and screened dolomite from Dolcito Quarry Company in 1959 and 1960, for use as concrete aggregate, for $1.55 per ton. In 1960 Dolcito Quarry Company quoted to plaintiff prices of $1.55 and $1.60 per ton for two sizes of crushed and screened dolomite flux stone.

**61.**

All of the dolomite produced during the years 1951 through 1957 by the five dolomite quarries operating in Alabama during those years, as above specified, was of like kind and grade. Dolcito's crushed stone during the years involved was beneficiated at the mine by the same ordinary treatment processes applied to the dolomite mined and used by Sloss and plaintiff for fluxing stone.

**62.**

There were during the years 1951 through 1957 in the Birmingham district representative market or field prices for dolomite of like kind and grade as the dolomite mined from the dolomite quarry of Sloss and plaintiff during those years and used by them as fluxing stone in their blast furnaces. Those prices were:[8]

| | |
|---|---|
| 1951 | $1.77 |
| 1952 | 1.78 |
| 1953 | 1.80 |
| 1954 | 1.78 |
| 1955 | 1.70 |
| 1956 | 1.80 |
| 1957 | 1.80 |

*Allocation of Selling Expense and General and Administrative Expense in Computing "Taxable" Income from the Property.*

**63.**

(a) For the years 1954 through 1957, the Revenue Agent in his reports, in determining plaintiff's "taxable" income "from the property" for percentage depletion purposes, in cases where he determined "gross income from the property" by reference to a "representative market or field price," allocated all of plaintiff's "general and administrative" expense among all of plaintiff's activities, including "mining," on the basis of the ratio of the direct costs of production assignable to each such activity. In so determining "taxable" income "from the property" for the years 1954 and 1955, he similarly allocated plaintiff's "selling expense" to all of its activities, including "mining" on the basis of the ratio of the direct costs of all such activities; for 1956 and 1957, he first made such an allocation and then deducted only one-third of the selling expense allocable to "mining" on the basis of the ratio of direct costs.

(b) "General and administrative expense" consists of the expenses of all of plaintiff's departments which serve the company on an overall basis, such as the treasurer's department, the executive department, the purchasing department, and the accounting department. "Selling expense" consists of salaries and expenses of salesmen, the expenses of plaintiff's sales offices which it maintains in most of the principal cities of the country, and any other expenses connected with selling the company's products.

**64.**

(a) In order to sell its principal product, cast iron pipe, plaintiff must

7. Contract prices for dolomite, specifying a maximum silica content of 1 per cent, sold to H. K. Porter Company for the production of refractories in 1959 and 1960 ranged from $2.00 to $2.15 per ton and in 1961 from $2.35 to $2.50 per ton, f. o. b. quarry.

8. After carefully sifting the relevant evidence the court concluded that the representative market or field prices in the Birmingham district for dolomite of like kind and grade to that mined by Sloss and plaintiff were those extracted from the first and second columns of Finding No. 58, supra.

engage in extensive sales activities. It must maintain sales offices all over the country; it has thousands of customers; a great part of its business is with contractors who make competitive bids for jobs, and salesmen must contact all the contractors who bid; the bulk of its business is with customers who have complicated specifications; there is intense competition not only from other cast iron pipe manufacturers, but also from producers of numerous substitute materials such as asbestos pipe, concrete pipe, steel pipe, and plastic pipe.

(b) During the years 1954 through 1957, none of its sales expense was incurred by plaintiff with respect to any sales of coal, red iron ore, brown iron ore, or dolomite.

(c) At most, a negligible amount of sales activity is required in selling such raw minerals. For example, when Sloss sold coal, the company had no coal salesmen; one individual in the executive department handled the sales negotiations which required little of his time. Similarly, Alabama By-Products Corporation, which currently sells about 3,000,-000 tons of coal for steam use, has no coal salesmen, and its coal sales negotiations have been handled by the company executives rather than its sales department; none of the expenses of its sales department have been incurred with respect to coal sales.

### 65.

The general and administrative expenses of plaintiff incurred per dollar of direct cost with respect to its pipe business are greater than such expenses which it incurs per dollar of direct cost with respect to its mining activities. For the last four full years prior to the merger of Sloss and plaintiff (1948 through 1951), the amount of Sloss' general and administrative expense allocable to mining on the basis of the ratio of direct costs was 50.6491 per cent of such expense which would have been allocable to mining on the basis of the ratio of direct costs if Sloss and plaintiff had been merged during those years.

*Economic Interest*

### 66.

During the years 1947 through 1954, inclusive, Shook & Fletcher Supply Company worked deposits of brown iron ore on land owned or leased by Sloss or plaintiff in the Russellville area in Franklin County, Alabama under an agreement with Sloss executed on April 2, 1946. The Revenue Agent determined that for all the said years Shook & Fletcher Supply Company had an economic interest in said deposits for percentage depletion purposes. This agreement granted Shook & Fletcher Supply Company the "exclusive" right to mine the iron ore in the designated properties for a period of five years. Shook & Fletcher Supply Company had the right to renew the agreement for an additional term of three years, which right it exercised in 1951. The agreement required Shook & Fletcher Supply Company to deliver all ore mined from the lands to Sloss or plaintiff for a specified amount per ton of ore delivered. The agreement provided that these amounts were based on metallic content of the ore and were subject to change to correspond with changes in wage rates. The specified amounts to be paid to Shook & Fletcher Supply Company were changed by agreement of the parties from time to time on the basis of increases in wages and production costs. Shook & Fletcher Supply Company did deliver the entire output of ore to Sloss or plaintiff at the designated prices except on occasion when Sloss or plaintiff by an agreement executed on January 7, 1947, temporarily authorized until November 28, 1950, diversions of ore not wanted or needed by them to other consumers, with a fixed royalty per ton to be paid to Sloss or plaintiff. The agreement gave Shook & Fletcher the right to build roads and install buildings; the extent to which this was done, if at all, was not disclosed. Shook & Fletcher Supply Company owned the washer, known as the Warner washer, at which ore mined from properties of Sloss or plaintiff under this agreement, as well as from properties not owned or leased

by Sloss or plaintiff, was processed. The washer was located on land in which Sloss or plaintiff owned the mineral rights but to which Shook & Fletcher Supply Company owned the surface rights. Under the agreement Shook & Fletcher were not given the right to mine to exhaustion, but in the event the ore deposits should become exhausted or otherwise inadequate during the term of the agreement, Shook & Fletcher had the right to terminate the agreement.

### 67.

During the years 1955 and 1956, Shook & Fletcher Supply Company worked deposits of brown iron ore on lands of Sloss or plaintiff in Franklin County, Alabama, under a new agreement with plaintiff executed on January 24, 1955, effective January 1, 1955. The Revenue Agent determined that for 1955 Shook & Fletcher Supply Company had an economic interest in said deposits for percentage depletion purposes, but made no such determination with respect to 1956. The question whether Shook & Fletcher Supply Company had an economic interest in said deposits is in issue in this case only for the year 1955. The aforesaid agreement provided expressly that Shook & Fletcher Supply Company was "employed" as a "Contractor" to recover iron ore at the plaintiff's direction as to tonnages to be delivered to plaintiff and subject to plaintiff's advance approval as to places where ore should be recovered and recovery processes. The agreement further provided expressly that Shook & Fletcher Supply Company should deliver all ore recovered "only" to plaintiff. Plaintiff agreed in the contract to pay to Shook & Fletcher Supply Company, "as compensation for the Contractor's services hereunder," a specified sum per ton of ore. The agreement was terminable at the will of either party on 90 days' notice. A witness from Shook & Fletcher Supply Company conceded at the trial that under this agreement Shook & Fletcher Supply Company was merely a contractor mining ore for a contract price.

### 68.

During the years 1949 through 1954, inclusive, Shook & Fletcher Supply Company worked deposits of brown ore on land in which Sloss or plaintiff owned the mineral rights in Blount County, Alabama, under an agreement with Sloss executed on February 1, 1949. The Revenue Agent determined that for all of said years Shook & Fletcher Supply Company, for percentage depletion purposes, had an economic interest in said deposits. By this agreement, in which the parties were referred to as "Lessor" and "Lessee," Sloss granted to Shook & Fletcher Supply Company the right to mine iron ore contained in designated lands for a period of five years, which period was extended in 1953 by written agreement for an additional five years. The agreement did not provide that Shook & Fletcher Supply Company should have the exclusive right to mine the properties or the right to mine them to exhaustion although it did provide that Shook & Fletcher could terminate the agreement in the event of exhaustion during the term of the agreement. The agreement provided that Shook & Fletcher Supply Company should pay to Sloss or plaintiff a "royalty" of 15 cents per gross ton for all iron ore mined from the designated lands. Sloss reserved the right to call for all or any part of the ore produced under the agreement at the current Birmingham market price and the understanding between the parties at the time the agreement was made was that Sloss intended to exercise this right and take the ore. If Sloss did not call for the ore, Shook & Fletcher was free to sell on the open market and did so to the extent of approximately 10 per cent of the total ore produced under the agreement. Shook & Fletcher was free under the agreement to mine as much or as little as it desired and wherever it chose within the specified lands. The agreement was terminable only for specified causes.

### 69.

During the years 1951 through 1954, inclusive, Schroeder Company worked de-

posits of brown iron ore on land in which Sloss or plaintiff owned the mineral rights in Franklin County, Alabama, under an agreement with Sloss dated May 24, 1951. The Revenue Agent determined that for all of said years Schroeder Company, for percentage depletion purposes, had an economic interest in said deposits. The agreement, in which the parties are referred to as "Lessor" and "Lessee," granted Schroeder Company the right to remove brown iron ore from the designated lands for a period of three years but did not provide that Schroeder Company should have the exclusive right to mine brown iron ore from the property or the right to mine to exhaustion. The agreement provided that Schroeder should pay to Sloss a royalty of 10 cents per long ton of ore removed from the properties by Schroeder under the agreement. By a contemporaneous agreement between the parties, expressly made a part of the aforesaid agreement, Schroeder agreed to sell and Sloss agreed to buy for fixed amounts per ton Schroeder's production of brown iron ore up to 10,000 tons per month for the first two years of the agreement and up to 5,000 tons per month for the third year, and Sloss was given the option of purchasing for the designated amounts per ton any additional brown iron ore produced by Schroeder in excess of said tonnages. These amounts were to be increased and decreased in accordance with the increases or decreases in prices paid by Sloss to other producers in the area. Schroeder had the right to build roads, buildings and other properties for purposes of mining, although the extent to which this was done was not shown. This agreement was for three years, with Sloss having the option, which was not exercised, to extend it for a further term of two years by six months' notice. It provided expressly that Sloss' "lease" to Schroeder of its mineral interests under the agreement described first above was in consideration of the execution of the purchase agreement. At the time these agreements were made, Sloss told Schroeder that it intended to take all of Schroeder's brown iron ore production, and Sloss or plaintiff did take substantially all of Schroeder's brown iron ore production during the period from 1951 through 1954 inclusive.

70.

During the years 1953 through 1957, R. A. Wade & Company extracted dolomite from a dolomite quarry owned by plaintiff and located in North Birmingham, under an agreement dated February 10, 1953, and an extension thereof dated February 10, 1956. The Revenue Agent determined that for the years 1954 and 1955 R. A. Wade & Company had an economic interest in said quarry for percentage depletion purposes. The question whether R. A. Wade & Company had an economic interest in said quarry is in issue in this case only for the years 1954 and 1955. By the agreement between plaintiff and R. A. Wade & Company dated February 10, 1953, plaintiff granted to Wade the right to mine dolomite from plaintiff's quarry in North Birmingham for a period of three years. It did not grant to Wade the exclusive right to mine dolomite from the quarry or the right to mine to exhaustion. The reserves in the quarry are sufficient to last for 26 years at the present quarrying rate. Wade was required by the agreement to quarry and furnish to plaintiff such dolomite as plaintiff from time to time ordered, in sizes $\frac{1}{4}$ inch to 4 inches, and was to receive $1.26 per gross ton (2240 pounds) for all stone delivered under the agreement. This amount was increased 15 cents per gross ton by agreement of the parties, effective August 1, 1955. Wade screened all dolomite quarried from the quarry to these sizes, and all dolomite of such sizes produced from the quarry was delivered to plaintiff and used in its blast furnaces as fluxing stone. The agreement provided further that all "screenings"—fines that pass through a $\frac{1}{4}$ inch screen—should be taken out of production and disposed of by Wade at locations approved by plaintiff, that in the

event Wade should be able to sell any of said "screenings" or fines he should pay to plaintiff a royalty of 15 cents per gross ton with respect thereto, and that in the event Wade could not sell such "screenings," plaintiff might at its option and its expense utilize them in any way it should see fit. Such "screenings" or fines were not suitable for use in the blast furnaces as flux stone. They were produced only from the crushing and screening of dolomite into flux-stone sizes, and Wade never quarried any stone for the purpose of crushing it into fines. About 12 to 15 per cent of the dolomite quarried was screened out as fines. The actual disposition of the fines was not disclosed. The agreement provided further that quarrying operations should be conducted by Wade at such locations as plaintiff should from time to time designate and in a manner satisfactory to plaintiff. The agreement required plaintiff to furnish to Wade all equipment owned by plaintiff and situated at the quarry and used therein immediately prior to the date of agreement, according to a list attached to the agreement as an exhibit, and pursuant to this, plaintiff did furnish all stationary equipment used in the operation of the quarry, including the crusher, screening facilities, and skips. Wade was required to furnish only movable equipment and replacements, as needed, for equipment furnished by plaintiff.

### Timeliness of Claims for Refund Filed in 1958

**71.**

(a) On December 12, 1955, plaintiff filed claims for refund as to percentage depletion for coking coal for Sloss' years 1947 through 1951 and the taxable year ending October 31, 1952, and as to plaintiff's taxable years 1952 and 1953. On December 26, 1956, plaintiff filed claims for refund as to percentage depletion for brown iron ore for all of the same years.

(b) With respect to the claims filed on December 12, 1955, as to Sloss' taxable years, the Revenue Agent's report dated March 21, 1956, as to such years stated:

"Taxpayer filed as of December 12, 1955, U. S. Treasury Department Form 843, claim for refund of taxes illegally, erroneously or excessively collected, wherein it alleged that the computation reflected in [sic] its returns for the years 1947 to 1952, inclusive, were erroneous, that there was as a matter of fact no representative fair market value for its coal during the years 1947 through 1952 and that in the absence of such representative fair market value it was entitled to compute the allowable percentage depletion on the proportionate profits method as set out in Section 39.23 (m)–1(e) (3) of Regulations 118.

"Taxpayer's claim for each of the years covered by this report has been carefully considered. Based on information available from taxpayer's records and other specific and general information concerning the market value of coal within taxpayer's mining area it has been determined that the valuations determined by taxpayer as reflected in its return for each of the years covered by this report are substantially correct. The claims for refund based on the proportionate profits computation are herewith rejected." [9]

---

**9.** The full excerpt from the Revenue Agent's report of March 21, 1956, quoted in Stipulation No. 1, paragraph 9(c), in addition to the portion reproduced above, contains the following:

"Taxpayer is engaged in the business of mining coal, ores used in the manufacture of pig iron, the manufacture of coke and its related by-products and the manufacture of pig iron. For purpose of computing depletion allowable on its various mining operations, taxpayer adopted the following methods provided under Section 23(m) of the Internal Revenue Code of 1939 [26 U.S.C.A. § 23(m).].
Coal—Representative fair market value
Ores—Proportionate profits

"In computing percentage depletion allowable on its coal mining operations, taxpayer determined the following amounts

(c) With respect to such claims filed on December 12, 1955, as to plaintiff's taxable years 1952 and 1953, the Revenue Agent's report dated December 6, 1956, as to such years stated:

"In its claims, taxpayer contends that the computation reflected in its returns for the year [sic] 1952 and 1953 were erroneous, that there was, as a matter of fact, no representative fair market value for its coal during the years 1952 and 1953 and that in the absence of such representative fair market value it was entitled to compute the allowable percentage depletion on the proportionate profits method as set out in Section 39.23 (m)-1(e) (3) of Regulations 118.

"Taxpayer's claim for each of the years covered by this report has been carefully considered. Based on information available from taxpayer's records and other specific and general information concerning the market value of coal within taxpayer's mining area it has been determined that the valuations determined by taxpayer as reflected in its return for each of the years covered by this report are substantially correct. The claims for refund based on

the proportionate profits computation are herewith rejected." [10]

*Sale of Manganese Ore*

72.

(a) When Sloss abandoned its ferromanganese business on July 31, 1950, it had on hand a supply of manganese ore, the raw material used to manufacture ferromanganese, and also had outstanding contracts calling for delivery of additional quantities. At the time, Sloss' management knew that its decision was irrevocable and that Sloss would never have occasion again to use its manganese ore in the production of ferromanganese. Manganese ore prices were rising rapidly and Sloss' management decided to hold the ore which it had on hand and to press for delivery of additional ore under outstanding contracts, with the hope of realizing gain through appreciation in the value of manganese ore.

(b) Sloss held the manganese ore on hand on July 31, 1950, and such ore delivered subsequently under its contracts then in effect, until March 1952. During the period it held the ore, it watched the market and engaged an import-export firm in New York to act as broker and to

---

as being the representative fair market value of its coal.
"(1) 1947—$5.424393 Per Ton
1948— 6.206964 Per Ton
1949— 6.287972 Per Ton
1950— 6.309761 Per Ton
1951— 6.250000 Per Ton
"(2) 1952—None shown (No percentage depletion on coal claimed)
"(1) The 1947 return reflects no computation for depletion. It appears however that the per ton valuation shown is the amount used by taxpayer in computing the estimated $600,000. depletion claimed on the return. (Coal & Iron ore)
"(2) Taxpayer claimed no percentage depletion on coal in its Federal Income Tax return for the period ended October 31, 1952, apparently on the basis that unit depletion exceeded allowable percentage depletion. A valuation of $6.25 per ton has been used in this report for the period ended October 31, 1952, in the computation of percentage depletion on coal."

10. The full excerpt from the Revenue Agent's report of December 6, 1956, quoted in Stipulation No. 1, paragraph 9(d), in addition to the portion reproduced above, contains the following:
"Taxpayers filed as of December 12, 1955, U. S. Treasury Department Form 843's, Claims for Refund of Taxes Illegally, Erroneously, or Excessively Collected. The claims covered the calendar years 1952 and 1953 and were for the following amounts:
1952                         $ 62,693.03
1953                           378,794.42
"The alleged overassessments are computed from a revised calculation of percentage depletion on coal. The principal change in the calculation being a change in the method of determining the fair market value of the coal. In its returns, taxpayer used a fair market value based on the selling price of its own or similar grades of coal as follows:
1952—                    $6.11 per Ton
1953—                    $6.201 per Ton."

inform Sloss when it appeared that the market had reached its peak. When Sloss sold the ore in 1952, it was sold to a single purchaser, Union Carbide Company. The sale was negotiated by the broker who executed the contract as agent for Sloss. Sloss realized a gain of $357,-944.82 on the sale and reported that gain on its return as long-term capital gain. The Revenue Agent in auditing the return treated it as ordinary income.

### *Abnormal Base Period Repairs*

#### 73.

During the year 1948, Sloss spent for repairs a total of $2,697,623.57, which was 148.3 per cent of the average annual amount ($1,819,035.35) spent for repairs during the four prior years (1944 through 1947) and which exceeded 115 per cent of that average amount by $605,732.92.

#### 74.

Sloss' gross income for income tax purposes during 1948 and 1949 was 174.433 per cent and 166.034 per cent, respectively, of its average gross income during the four preceding years, 1944–1947. During 1948 and 1949 there was an increase in the average selling prices of Sloss' products, and an increase in its gross income.

#### 75.

The Court finds that plaintiff has not produced evidence sufficient to establish the negative fact that excess repairs during the base period, 1948, were not a cause or consequence of an increase in its gross income in such base period.

### *Stipulated Issues*

#### 76.

The parties have stipulated, in subparagraphs (c) through (g) of Paragraph 8 of the Stipulation signed on November 29, 1961, that certain adjustments are to be made in the computation of plaintiff's tax liability for the years 1954 through 1957. The Court finds the facts on which these adjustments are based to be as stipulated.

### CONCLUSIONS OF LAW

#### 1.

The Court has jurisdiction of this action and of the parties hereto. All procedural requirements for bringing the action have been met.

#### 2.

The claims for refund on which plaintiff relies were timely as to all tax and interest paid with respect to each taxable year here involved.[11]

#### 3.

Section 114(b)(4) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 114 (b)(4) and Section 613 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 613 provide that, for natural deposits of certain ores and minerals, the deduction allowable for depletion (in computing "net" or "taxable" income) shall be a specified percentage of "gross income from the property" excluding therefrom "an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property", subject to the limitation that the deduction cannot exceed 50 per cent of the taxpayer's "net" or "taxable" income from the property computed without allowance for depletion. The statutes also define "gross income from the property" to mean "gross income from mining" and then specially provide that "mining" shall include not only extraction from the ground but also certain "ordinary treatment processes."

11. United States v. Andrews, 302 U.S. 517, 524, 58 S.Ct. 315, 82 L.Ed. 398 (1938); Angelus Milling Co. v. Commissioner, 325 U.S. 293, 65 S.Ct. 1162, 89 L.Ed. 1619 (1945); Dale Distributing Co. v. Comm'r, 269 F.2d 444 (C.A.2 1959); St. Joseph Lead Co. v. United States, 190 F.Supp. 637 (S.D.N.Y.1960); Cf. Alabama By-Products Corp. v. Patterson, 151 F.Supp. 641 (N.D.Ala.1957), aff'd, 258 F.2d 892 (C.A.5 1958), wherein no subsequent claim for refund was filed to amend or supplement the claim postulated upon the single contention that taxpayer was entitled to use the proportionate profits method in computing percentage depletion on coal.

**4.**

During all the years in suit, Sloss and plaintiff were entitled to a percentage depletion deduction for their coal, red iron ore, and brown iron ore. The rate specified for coal was 5 per cent for the years 1947 through 1950 and 10 per cent for the years 1951 through 1957. The rate specified for iron ore was 15 per cent during all the years here involved. For the years 1951 through 1957, Sloss and plaintiff were entitled to a percentage depletion deduction for dolomite; the rate specified for 1951 through 1953 was 10 per cent and, for 1954 through 1957, 15 per cent. I.R.C.1939, § 114(b) (4) (A); I.R.C.1954, § 613(b).

**5.**

For all the years here involved, the applicable Treasury regulations provides that where, as here, a taxpayer does not sell its crude mineral product in the immediate vicinity of the mine, but instead processes it beyond ordinary treatment processes, "gross income from the property" shall be determined by reference to "the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied * * *."; if there is no such "representative market or field price," then "gross income from the property" is to be determined by deducting from the "representative market or field price" of the first marketable product, the costs and proportionate profits attributable to processes beyond ordinary treatment processes. Treas.Reg. 111, § 29.23(m)–1(f); Treas.Reg. 118, § 39.23(m)–1(e) (3); T.D. 6091, C.B. 1954–2, 47.

**6.**

With respect to Sloss' and plaintiff's Mary Lee coking coal there was during each year, 1947 through 1957, a "representative market or field price" for a "mineral product of like kind and grade

* * * as beneficiated by the ordinary treatment processes actually applied" by Sloss and plaintiff. See Alabama By-Products Corp. v. Patterson, 151 F.Supp. 641 (N.D.Ala.1957), aff'd, 258 F.2d 892 (5th Cir.1958), cert. denied, 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed. 2d 303 (1959); Woodward Iron Company v. Patterson, 173 F.Supp. 251 (N.D. Ala.1959).[12]

**7.**

■ This Court has found as a fact that during the years here involved representative market or field prices existed for the Mary Lee seam coal mined by Sloss and plaintiff, since there were sales, in the Birmingham district, of coal of like kind and grade as beneficiated by the ordinary treatment processes actually applied by Sloss and plaintiff. The prices found appear in Finding of Fact No. 30, supra. It follows, therefore, that Sloss and plaintiff must compute their depletion base, "gross income from the property" for their Mary Lee coking coal by reference to such representative market or field prices.

**8.**

■ This Court has found as a fact that during the years here involved there were representative market or field prices for the brown iron ore mined from properties of Sloss and plaintiff and used by them in the manufacture of pig iron, since there were during said years sales, in the Birmingham district, of brown ore of like kind and grade as beneficiated by the ordinary treatment processes actually applied by Sloss and plaintiff. The findings of the Court set out the basis and method for computing said prices according to the percentage of iron and manganese in the ore, with adjustments for freight and severance tax as therein explained. (Finding of Fact No. 37, supra.) It follows, therefore, that Sloss and plaintiff must compute their deple-

---

12. United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed. 2d 1581 (1960), makes it clear that the Congress intended to treat integrated mining-manufacturing operations as if the operator were selling the mineral mined to itself for fabrication.

tion base, "gross income from the property," for brown iron ore by reference to such representative market or field prices.

9.

■ This Court has found as a fact that during the years 1954 through 1957, inclusive, there were no representative market or field prices for the red iron ore (hematite) mined from plaintiff's Sloss underground red iron ore mine and used by it in the manufacture of pig iron, since there were not during said years any sales in the Birmingham district of red iron ore of like kind and grade as beneficiated by the ordinary treatment processes actually applied by plaintiff. It follows, therefore, that as determined by the Revenue Agent, plaintiff's depletion base, "gross income from the property," for red iron ore for the said years must be computed by the proportionate profits method provided in the regulations referred to in paragraph 5 of these Conclusions of Law.

10.

■ This Court has found as a fact that during the years 1951 through 1957 there were representative market or field prices for the dolomite mined from the dolomite quarry of Sloss and plaintiff and used by them as fluxing stone in their blast furnaces, since there were during said years sales, in the Birmingham district, of dolomite of like kind and grade as beneficiated by the ordinary treatment processes actually applied by Sloss and plaintiff. The prices found appear in Finding of Fact No. 62, supra. It follows, therefore, that Sloss and plaintiff must compute their depletion base, "gross income from the property," for their dolomite by reference to such representative market or field prices.

11.

■ During the years 1954 through 1957, none of plaintiff's selling expense was properly or fairly allocable to its coal, brown iron ore, and dolomite properties, or to "mining" and none of such selling expense is to be deducted from plaintiff's "gross income from the property" in computing its "taxable income from the property" with respect thereto.

12.

■ During the years 1954 through 1957, only 50.6491 per cent of plaintiff's general and administrative expense allocated to taxpayer's coal, brown iron ore, and dolomite properties or "mining" by the Revenue Agent (on the basis of the ratio of direct costs) was properly or fairly so allocable, and only 50.6491 per cent of such expense allocated thereto by the Agent is to be deducted from plaintiff's "gross income from the property" in computing its "taxable income from the property" with respect thereto.

13.

■ Under the agreements of April 2, 1946, as modified and extended, and January 24, 1955, whereby brown iron ore deposits owned by Sloss or plaintiff in Franklin County were mined by Shook & Fletcher Supply Company during the years 1947 through 1955, Shook & Fletcher Supply Company acquired an economic interest in said ore deposits only in the period from January 7, 1947, to November 28, 1950, when Shook & Fletcher Supply Company was authorized to sell ore mined from lands owned by Sloss or plaintiff to buyers other than Sloss or plaintiff. Shook & Fletcher Supply Company and Schroeder Company did have an economic interest in the brown iron ore deposits owned by Sloss or plaintiff and which were mined by Shook & Fletcher Supply Company in Blount County during the years 1949 through 1954 and by Schroeder Company in Franklin County during the years 1951 through 1954. R. A. Wade & Company did not have an economic interest in dolomite deposits owned by plaintiff in North Birmingham and mined by R. A. Wade & Company during the years 1954 and 1955. In each of the years and to the extent in which it is concluded above that Shook & Fletcher Company and Schroeder Company had an economic interest in mineral deposits owned by Sloss or plaintiff, Sloss or plaintiff also retained concurrently an eco-

nomic interest therein. In the years and to the extent in which it is concluded that Shook & Fletcher Supply Company, Schroeder Company, and R. A. Wade & Company did not have an economic interest in said mineral deposits, plaintiff is entitled to the entire depletion deduction with respect thereto.[13]

14.

■ At the time that Sloss sold its ferromanganese ore in March, 1952, such ore was a "capital asset" in its hands under Section 117(a) (1) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117 (a) (1) and the gain of $357,944.82 realized from such sale was properly taxable as long-term capital gain rather than as ordinary income.

15.

■ In computing its excess profits credit for the year 1950 and for the taxable period ending October 31, 1952, under Section 435 of the Internal Revenue Code of 1939, 26 U.S.C.A. Excess Profits Taxes, § 435, Sloss was not entitled to exclude the sum of $605,732.92 in determining its base period net income for the year 1948. I.R.C.1939, § 433(b) (9), 26 U.S.C.A. Excess Profits Taxes, § 433 (b) (9). This is the amount by which Sloss' deduction for repairs in that year exceeded 115 per cent of the average amount of its deductions for repairs for the four previous taxable years. Plaintiff has not established as required by Section 433(b) (10) (C), that "the increase in such deductions * * * is not a cause or a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, which increase or decrease is substantial in relation to the amount of the increase in the deductions of such class * * *." [14]

16.

In recomputing plaintiff's tax liability for the years 1954 through 1957, effect shall be given to the adjustments therein stipulated in subparagraphs (c), (d), (e), (f) and (g) of Paragraph 8 of the stipulation signed by the parties on November 29, 1961.

17.

Judgment in conformity with the foregoing Findings of Fact and Conclusions of Law will be entered when the amount thereof has been computed by the parties.

13. Parsons v. Smith, 359 U.S. 215, 79 S. Ct. 656, 3 L.Ed.2d 747 (1959); Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062 (1946); Denise Coal Co. v. Commissioner, 271 F. 2d 930 (C.A.3 1959); United States v. Stallard, 273 F.2d 847 (C.A.4 1959); Commissioner of Internal Revenue v. Mammoth Coal Co., 229 F.2d 535 (C.A.3 1955); Stilwell v. United States, 250 F. 2d 736 (C.A.4 1957); Commissioner of Internal Revenue v. Hamill Coal Corp., 239 F.2d 347 (C.A.4 1956); Calvert & Youngblood Coal Co., Inc. v. United States, 60–2 U.S.T.C. Par. 9748 (N.D.Ala. 1960).

14. William Leveen Corp. v. Commissioner, 3 T.C. 593 (1944); Horton & Converse v. Commissioner, 8 T.C. 487 (1947); The Locomotive Finished Material Co. v. Commissioner, 25 T.C. 240 (1955).